JILL S. EDEN et al., Appellants, v BOARD OF TRUSTEES OF THE STATE UNIVERSITY OF NEW YORK et al., Respondents.

Second Department, November 10, 1975

*Donner, Fagelson, Hariton & Berka, P. C. (Frederick Fagelson* of counsel), for appellants.

*Louis J. Lefkowitz, Attorney-General (Michael P. Fogarty* and *Samuel A. Hirshowitz* of counsel), and *Walter J. Relihan, Jr. (Richard C. Cahn* and *David S. J. Neufeld* of counsel), for respondents.

GULOTTA, P. J. In the fall of 1974 the State University of New York at Stony Brook, Long Island, sent literature to colleges and students throughout the Country announcing that it was going to establish a School of Podiatric Medicine (SPM) in its Health Sciences Center late in the summer of 1975, leading to the degree of Doctor of Podiatric Medicine after a four-year course, with an initial class of 24 students. The literature solicited applications from students. Several hundred students applied.

Twenty-four applicants were accepted between December, 1974 and February, 1975, including the 15 petitioners, and thereafter, on May 9, 1975, all of them were notified by the Dean of SPM that "all contingencies" as to their acceptance by the school "were removed". However, on June 4, 1975 the Division of the Budget of the State of New York informed the State University of New York (SUNY) that the scheduled opening of SPM "has been deferred". Accordingly, the Dean of

SPM notified these accepted applicants that they had to "suspend" their "plans to matriculate at Stony Brook in the coming academic year".

The petitioners then commenced this proceeding under CPLR article 78 on July 1, 1975 against SUNY at Stony Brook et al. for relief, generally stated, to compel them to operate SPM and to permit the petitioners to attend the school as matriculated students. A trial was had at Special Term in Suffolk County, following which a judgment was entered dismissing the petition. The petitioners have appealed from the judgment to this court. Pending the appeal, the petitioners (some if not all) have been attending classes at the Health Sciences Center of SUNY at Stony Brook by reason of temporary orders granted successively by the Special Term and this court, i.e., classes which are basically the same for entering students at most of the schools in the center for the first two years.

The petitioners contend that (1) they acquired a vested contractual right to be admitted to the 1975 entering class of SPM; (2) the respondents are estopped from denying them such admission; and (3) the Education Law should be construed so as to compel such admission. The respondents, in addition to arguing against these contentions, claim that SUNY had no capacity to contract with the petitioners and that SPM never came into existence, that the deferment of the school opening was in good faith because of fiscal crisis and that the petitioners have no legal right to the relief they seek.

By reason of these conflicting positions of the parties it is necessary to consider pertinent statutes and action taken by State officials.

SUNY, created by the Legislature as of July 1, 1948 (L 1948, ch 695 [Education Law, § 352]), is a corporation within the State Education Department and the University of the State of New York; it is governed by a board of trustees; and it consists of certain existing State colleges and institutes "and such additional liberal arts, professional and graduate colleges and universities * * * as have been, since * * * [the time SUNY came into being] or hereafter may be acquired, established, operated or contracted to be operated for the state by the state university trustees" (Education Law, § 352, subds 1, 3; § 353). One of the SUNY colleges is the one located at Stony Brook.

The Legislature has also dealt with the subject of planning with respect to higher education in the State, involving therein SUNY, the State regents and the Governor of the State. Section 354 of the Education Law, entitled "Powers and duties of state university trustees—planning functions", requires the trustees of SUNY "1. * * * once every four years, [to] formulate a long-range university plan or general revision thereof and make recommendations to the board of regents and the governor for the organization, development, coordination and expansion of the state university * * * which plan and recommendations shall include * * * b. Plans for new facilities." This section further states that, "as approved by" the regents and incorporated into the regents' plan or general revision thereof, etc., "and, upon approval thereafter by the governor, such plan shall guide and determine the development and expansion of the state university".

Section 237 of the Education Law, entitled "Regents plan for higher education, including approved plans of state university and city university of New York and plans of private institutions of higher education", requires that the regents review the plan and recommendations submitted by the trustees of SUNY under section 354 and, upon approval thereof by the regents, submit them, in their own "plan or general revision thereof for the development of higher education in the state to the governor and the legislature"; and further provides that "such plan or general revision thereof or so much thereof as shall be approved and upon such terms and conditions as the governor may impose, shall become effective upon such approval by the governor."

Section 355 of the Education Law, entitled "Powers and duties of trustees—administrative functions", states: "1. Subject to the provisions of the plan or general revision hereof proposed by the state university trustees as approved by the regents pursuant to section two hundred thirty-seven of this chapter, the state university trustees shall be responsible for: * * * d. The establishment of health and medical centers, four year liberal arts colleges, professional and graduate schools, research centers and other facilities, as provided in this article."

Let us turn, now, to the proof. The initial planning for the creation of SPM took place in 1973 and the Legislature appropriated $107,000 for the 1974–1975 fiscal year for salaries for faculty and staff to engage in the planning. A dean for

SPM was appointed on June 1, 1974 on tenure. A faculty of four professors was hired. Literature announcing the formation of SPM and soliciting students was disseminated, and the 24 student applications were accepted. When petitioner Jill Eden was accepted, in December, 1974, she declined to enter another college which had accepted her for a podiatric course and, when she later received notice that SPM would not open, it was too late to obtain admission to the other college. Similarly, other petitioners chose SPM over other schools of podiatry.

On January 28, 1975 SUNY transmitted its proposal to establish SPM to State Education Commissioner Nyquist, with a request for transmission of the proposal to the regents and the Governor. SUNY also transmitted the proposal to the Governor directly at the same time. The regents approved the proposal (as amended in the interim) on April 25, 1975. All this was apparently in accordance with the procedures contemplated by sections 237 and 354 of the Education Law.

The Legislature, on the recommendation of the Governor, included in the State budget enactment for 1975–1976, on March 25, 1975, a total of $330,804 for annual salaries and the admission of the 24 students. On June 27, 1975, the National Institutes of Health, Public Health Service, approved a grant of $162,687 for SPM for its first year, as part of a three-year grant.

In the meantime, however, adverse economic conditions of the State were impelling the forging of a Damocles sword for SPM and its 24 admitted students. Early in April, 1975, the State Budget Director notified SUNY (State headquarters in Albany) that there was to be an "expenditure ceiling for the year 1975–76". This led to a series of meetings, at one of which the Budget Director informed SUNY that it would probably be cut by $7,500,000 in the budget and that additionally SUNY would have to raise $18,000,000 elsewhere as part of its budget, so that the tax support of SUNY for the year would be reduced about $25,000,000. Because of this, the decision was made, in mid-May, to defer the opening of SPM.

This was followed by the July 3, 1975 letter to Commissioner Nyquist by the Governor that, in view of SUNY's deferment of the opening of SPM and the proposed reassessment of all SUNY's programs, including "the need for" SPM, "in line with the State's fiscal resources," he [the Governor]

"will defer action on the proposed" SPM "until the review is completed".

At the trial at Special Term the Dean of SPM gave testimony to fend off the apparent impact of the budget crunch upon the question of the opening of SPM. He said that the deferment of the opening would result in "no savings, and in fact there would be a loss" because "all the money is encumbered" (apparently meaning that the personnel hired for SPM would have to be paid), the Federal grant of $162,687 would be forfeited if SPM did not open, and no construction of buildings, etc., was required for SPM to open. Further, on this issue, counsel for the respondents conceded that SPM "was established, ready to go, except for this deferment." The respondents made no serious attempt to contradict this testimony. With respect to the deferment decision, a Vice Chancellor of SUNY testified that "it was a determination that it would be unwise to make a commitment for a new program which was not large amounts of money in the fall of 1975–76 but which would be large amounts of money in the future."

We now turn to the petitioners' points, the first of which is their claim of a vested contractual right. We have no doubt that, apart from the question of SUNY's capacity to contract with the petitioners, its acceptance of the petitioners' applications satisfies the classic requirements of a contract. Neither the respondents nor the Special Term questioned this. The Special Term, however, overcame this point by saying that "the state or its agencies may legally abrogate a pre-existing contract when acting in the public interest in the face of a fiscal crisis." It also held that the decision to defer the opening of SPM was not "arbitrary and capricious and an abuse of discretion."

We do not agree that "a fiscal crisis" required the decision or that the deferment decision was not arbitrary, capricious and an abuse of discretion. *There was no rational basis for the State's conclusion that saving money for future years justified failing to open the school for the 1975–76 academic year, in the face of the existing contracts with the petitioners.*

We recognize that the judicial branch of the State must exercise restraint in questioning executive prerogative, especially where budgetary and fiscal problems may require elimination or curtailment of State-provided services *(Matter of Foster v Hurd,* 20 AD2d 847). However, we are not foreclosed from examination of the issue of whether the abrogation of

contract here will indeed save any money. If, unquestionably, it will not, because the same money will be spent *whether or not the petitioners' contracts are abrogated,* the action taken by the State must be deemed arbitrary and capricious and no basis for any claimed exemption from the inhibition of section 10 of article I of the Constitution of the United States.

The evidence was undisputed that the deferment decision would save no money, but would rather result in a monetary loss (the Federal grant). We also note that the students' tuition fees and miscellaneous charges would add some income.

There remains the issue of whether the State is estopped from asserting the lack of capacity of the university officials at Stony Brook to contract for admission of the petitioners because the final step in the master plan revision had not been taken.

All the activities of SUNY pointing toward the opening of SPM, including the representations by SUNY in its literature disseminated to solicited prospective students, told the petitioners they could rely on their being given the schooling in question. They made their plans and took action in reliance thereon, including their declining matriculation in other schools of podiatry. If they are now to be denied their schooling in SPM they will, at the least, lose a year in furtherance of their chosen careers. They might even lose their chance ever to be admitted to a school of podiatry, since admission to such schools is extremely competitive. There cannot be a clearer case for estoppel (see *Metropolitan Life Ins. Co. v Childs Co.,* 230 NY 285, 292–293; *Triple Cities Constr. Co. v Maryland Cas. Co.,* 4 NY2d 443, 448).

As to SUNY's claim that it had no capacity to contract with the petitioners and that SPM was a nonexistent school, and that that must defeat the estoppel argument, we answer that estoppel sometimes involves a flaw in the steps leading to the finality of a contract and we see no difference, in principle, between a flaw as to capacity and any other flaw in the preliminaries to a contract. The larger problem, the true issue, is whether the State may ever be estopped under circumstances in which a private party would be estopped and, if so, what facts must be shown.

American Jurisprudence 2d (vol 28, Estoppel and Waiver, § 123) states that although "a state is not subject to an estoppel to the same extent as is an individual or a private

corporation" and that the principle "should not be lightly invoked against the state", nevertheless it will be applied "when justified by the facts" or where "necessary to prevent * * * manifest injustice". (See, also, 2 Antieau, Municipal Corporation Law, § 16A.00; 6 McQuillin, Municipal Corporations, § 20.13; *Moore v Mayor, etc., of City of N. Y.,* 73 NY 238, 246; *Vermeule v City of Corning,* 186 App Div 206, affd 230 NY 585; *Vandeweghe v City of New York,* 150 Misc 815, affd 242 App Div 762; *Robinson v City of New York,* 24 AD2d 260; 21 Univ of Chicago L Rev 680, 707.)

Estoppel against the State is to be applied only in truly exceptional cases, involving, as it often does, an intrusion, *pro tanto,* by the judiciary, into the prerogatives of other branches of the government. But no branch is entirely immune from scrutiny. The courts must weigh the degree of manifest injustice against the effect, in the particular case, of intervention into the public processes *(City of Long Beach v Mansell,* 3 Cal 3d 462). There is no rule of thumb.

We hold that in this case the respondents are estopped from asserting lack of capacity to contract with the petitioners as to the 1975–1976 academic year, because (1) the representations by SUNY, which had been given apparent authority, misled the student applicants and placed them in an extremely dubious position; (2) the alleged basis for the deferment, after unequivocal acceptance, was a false budgetary consideration, for it will not save money for the academic year in question and therefore has no relevant rationale; (3) the injustice to petitioners otherwise resulting would far outweigh the minor effect upon public interest or policy which may result from invoking estoppel; and (4) the precedent set by allowing estoppel is narrow in that it depends upon a considerable combination of governmental actions not likely to recur (cf. *City of Long Beach v Mansell,* 3 Cal 3d 462, 496–497, 498, *supra).*

We make no decision and express no opinion as to the rights of the petitioners as to any period beyond the 1975-1976 academic year.

The judgment should be reversed, on the law and the facts, without costs, and the petition should be granted. The petitioners should be enrolled as students for the 1975-1976 academic year, upon compliance with the originally planned procedures for admission.

RABIN, MARTUSCELLO, LATHAM and SHAPIRO, JJ., concur.

Judgment reversed, on the law and the facts, without costs, petition granted, and it is directed that petitioners be enrolled as students for the 1975–1976 academic year, upon compliance with the originally planned procedures for admission.