MARVIN GILL, an Infant, by His Mother and Natural Guardian FRANCES GILL, et al., Respondents, v NEW YORK CITY HOUSING AUTHORITY, Appellant.

First Department, September 24, 1987

### APPEARANCES OF COUNSEL

*Arthur N. Seiff* of counsel *(Allen H. Isaac* with him on the brief; *Gladstein & Isaac,* attorneys), for appellant.

*Fred R. Profeta, Jr.,* of counsel *(Blauman & McCabe,* attorneys), for respondents.

### OPINION OF THE COURT

MURPHY, P. J.

The issue in this case is whether defendant Housing Authority may be held to a duty to prevent the mental illness of one of its tenants from erupting into violent behavior injurious to another tenant.

On July 23, 1982, Marvin Gill, then 16 years of age, was attacked and stabbed repeatedly by Ernest Lamb. Both Gill and his assailant were tenants in a building owned and operated by the New York City Housing Authority situated at 3353 Fort Independence Street in The Bronx. The stabbing occurred in one of the building's hallways. It is not disputed for the purposes of this litigation that in the moments just prior to the attack Ernest Lamb exhibited signs of acute emotional disturbance and that the stabbing itself was prompted by Lamb's then evident psychosis.

About one year after the incident, Marvin Gill, by his mother Frances Gill, commenced the within lawsuit against the Housing Authority. They alleged in their complaint, *inter alia,* that Ernest Lamb had a lengthy psychiatric history and was known to be a violent and dangerous tenant; that defendant Housing Authority knew or should have known that Ernest Lamb presented a danger to other tenants; that defendant had a duty to keep its tenants safe and secure while traversing common areas; and that defendant breached its duty to its tenant Marvin Gill when it failed to evict Ernest Lamb prior to the assault, or to post warning signs, or to take steps to control Lamb.

The proof adduced at trial established that Ernest Lamb, his parents and his siblings had been tenants in defendant's building since 1975. Either shortly before the time the Lambs moved into the Housing Authority project or soon thereafter, Ernest, then in his midteens, began to exhibit symptoms of mental illness. He was treated for a period as an outpatient at Metropolitan Hospital but eventually required inpatient treatment at Bronx Psychiatric Center. Upon his discharge he returned home to live with his family. Despite his psychiatric problems, there were no complaints about Ernest registered with the Housing Authority until March 1976. At that time, Ernest on one occasion wandered in and out of an upstairs

neighbor's open apartment. The incident, which was otherwise inconsequential, was reported by the neighbor and investigated by Housing Authority personnel. On speaking with Ernest's father, Rennick Lamb, the Housing Authority learned that Ernest had been psychiatrically hospitalized some months before and had since been receiving outpatient care and medication. Rennick Lamb indicated that he had discussed the incident with Ernest and had told him not to walk around the building. This was the only complaint concerning Ernest made by a tenant outside of the Lamb household until the event more than six years later which gave rise to the within lawsuit.

During the intervening time only two incidents respecting Ernest were brought to defendant's attention. The first of these occurred in March 1979, and the second in May of the same year. On both occasions, Ernest's parents sought the assistance of the Housing Authority police to bring their son to the hospital. The police responded routinely to the Lambs' request for assistance and Ernest was transported without complication to the hospital by ambulance where he was admitted for psychiatric treatment. No violence was reported in connection with either incident.

The last notation in defendant's records concerning Ernest Lamb prior to the Gill stabbing is dated January 5, 1980. On that date, an annual rent review was conducted and the Lambs were interviewed briefly for that purpose. In the course of the interview, defendant learned that Ernest was no longer receiving treatment.

The evidence adduced at trial also included testimony as to matters involving Ernest Lamb never brought to defendant's attention. This testimony indicated that Ernest had been hospitalized on numerous occasions, and that there had, from time to time, been family quarrels in which Ernest participated. The only incident which involved any violence, and which it must be underscored was never reported to defendant, was one recounted by the plaintiff in which Ernest was said to have grabbed plaintiff about the neck while making some inappropriate remark. The incident allegedly occurred about 2½ weeks before the stabbing.

Based upon the foregoing evidence and the undisputed fact that defendant had not acted to control Lamb or evict him, the jury found defendant liable for negligence and proceeded to award damages to the plaintiffs in the total amount of $194,972. This appeal followed.

Initially, it must be observed that defendant's actual knowledge respecting Ernest Lamb afforded it no way of foreseeing an armed assault of the sort that occurred. As of the date of the Gill incident, defendant knew only that Ernest Lamb was mentally ill; that he had been treated for his illness on both an inpatient and outpatient basis; and that as of January 1980, he was not being treated. Notwithstanding Lamb's history of mental illness, defendant had received but one complaint concerning behavior susceptible of description as tenant misconduct. This very minor incident, both unprecedented and unrepeated, was duly investigated and the matter was appropriately laid to rest.

Even plaintiff does not argue seriously that defendant possessed information from which it could have foreseen that Lamb would become dangerous and violent toward other tenants. Rather, plaintiff advances as its "threshold claim" the argument that had defendant diligently acquired information about Ernest Lamb as plaintiff urges it should have, it would have learned that Ernest Lamb was, to use plaintiff's phrase, "a ticking bomb with an obvious potential for enormous violence."

This conclusion, however, finds little support in the trial evidence. For the most part, that evidence simply confirmed that Ernest Lamb was chronically mentally ill and periodically required institutional care. When he was not in the hospital he lived with his family and, as might be expected, there were occasional family quarrels. The picture of Ernest Lamb which emerges from the trial testimony is not that of a violent person. To the contrary, Ernest is described as afraid of going outside, as someone who spent most of his time alone, and as a frequent victim of abuse rather than an aggressor. Indeed, the first instance in which it can be said that Ernest Lamb behaved violently was the one which allegedly occurred some 2½ weeks before the stabbing when Ernest grabbed plaintiff about the neck. But, as noted, this incident was never brought to defendant's attention.

It is, in fact, not upon the proof offered at trial that plaintiff ultimately rests its claim as to Ernest Lamb's "obvious potential for enormous violence", but upon what a satisfactory investigation of Lamb would have revealed. Plaintiff reasons that Lamb was indisputably dangerous at the time of the stabbing and that had he been properly scrutinized by defendant, his violent propensities would have been revealed. Plain-

tiff suggests that defendant should have examined the records of Ernest Lamb's Bronx Psychiatric Center hospitalizations and that the Lambs could have been compelled to disclose psychiatric information concerning Ernest on pain of eviction if they refused to do so. Plaintiff maintains, in addition, that the continuation of Ernest's tenancy should have been conditioned upon his submission to a psychiatric examination.

But the endpoint of plaintiff's argument is not that Ernest's dangerousness would have been apparent to defendant if it had conducted a proper investigation; plaintiff goes further, urging that defendant's failure to investigate Lamb as it should have, equitably precludes it from arguing that Lamb's dangerousness was not foreseeable.

Plaintiff is, in our view, mistaken, both as to what an investigation of the sort advocated would most probably have revealed, and as to the preclusive effect of defendant's failure to conduct such an investigation.

The fact that Ernest Lamb eventually became dangerous does not mean that he was always dangerous or that his impending dangerousness was reasonably foreseeable by defendant. We can, on the present record, only speculate as to what Ernest Lamb's hospital records would have shown, or what a psychiatric examination at any given point during Ernest Lamb's seven-year tenancy would have disclosed. Given the widely recognized inherent difficulties in predicting dangerousness *(see, e.g.,* Monahan, Clinical Prediction of Violent Behavior, at 47-49 [1981]), we cannot simply assume that the results of the sort of investigation plaintiff would have had defendant perform would support plaintiff's otherwise unfounded assertion that Ernest Lamb was "obviously potentially dangerous".

The plain fact is that based upon the evidence in the record, plaintiff has not met its burden of establishing that the complained of harm was foreseeable. To compensate for this fundamental deficiency in its prima facie proof of negligence, plaintiff alludes to "what a proper follow-up might have revealed" about Ernest Lamb. Plaintiff is, of course, well aware that "what a proper follow-up might have revealed" does not constitute proof that Lamb's conduct was in fact foreseeable. *(See, Danielenko v Kinney Rent A Car,* 57 NY2d 198, 204.)* Rather, the point of the allusion is to remind us that defendant did not do what plaintiff claims it should have. For its alleged failure to follow up and acquire information as

to Lamb's propensities, defendant should, according to plaintiff, be estopped from contesting the foreseeability issue. Indeed, plaintiff argues, in so many words, that foreseeability is not an issue in this negligence action.

The estoppel plaintiff would impose in order to avoid the very serious evidentiary deficiencies on the foreseeability issue, presupposes that defendant had some duty to investigate Ernest Lamb so as to be able to assess his potential for dangerous behavior. This is not the case. Not only was there no duty to investigate Ernest Lamb, but an investigation of the sort urged by defendant would have been grossly violative of his and his family's civil rights.

Plaintiff modestly proposes that the records of Ernest Lamb's psychiatric hospitalization should have been examined; that Ernest Lamb should have been made to submit to psychiatric examination; and that Lamb's parents should have been forced to provide psychiatric information. Plaintiff further suggests that the Lambs could have been summarily evicted from their low-income housing accommodations if they failed to make the requested disclosure.

What is the factual predicate for this proposed massive invasion of privacy by a public authority? Certainly, it is not that Ernest Lamb walked in and out of another apartment. Nor can it be that he occasionally quarreled with his family. Even an extensive history of psychiatric hospitalization would not justify such an inquisition; once a patient has been discharged from a psychiatric institution with appropriate aftercare provisions (see, Mental Hygiene Law § 29.15 [a], [f]), the presumption must be that the problem which caused the hospitalization has been treated and that the individual no longer poses a danger to himself or others. (See, Mental Hygiene Law § 33.01.) There is nothing in the record before this court which could conceivably support the kind of inquiry which plaintiff claims defendant should have made. It is worth pointing out in this regard that psychiatric hospital records are confidential (Mental Hygiene Law § 33.13), and that the receipt of services for mental disability is not a permissible predicate for depriving a person of any civil right to which he or she is otherwise entitled (Mental Hygiene Law § 33.01). A person's civil rights include, of course, the constitutional right of privacy and the right to be free of unreasonable searches.

Moreover, defendant could not have summarily evicted the Lambs for failing to cooperate with an investigation of their

son's psychiatric condition. As plaintiff is well aware, the defendant is bound by detailed rules and regulations setting forth specific grounds for eviction and the procedural protections to be afforded those whose tenancies are subject to termination. The failure of a tenant or his family to supply confidential information is not a ground for eviction. To evict a tenant or condition the continuance of a tenancy upon some special requirement, defendant is first required to show that the tenant has conducted himself in a nondesirable way *(Matter of Tejada v Christian,* 71 AD2d 527). Prior to the Gill stabbing, the record discloses no ground for a nondesirability proceeding against the Lambs.

The practical consequence of requiring defendant to perform a "follow-up" of the sort proposed by plaintiff, based upon a factual predicate as meager as that in this case, is that defendant will be obliged to conduct a sweeping investigation of every tenant within its knowledge afflicted with a psychiatric condition that could in some way cause harm to another tenant. And, it must be noted that the foreseeability of the harm would be in no way relevant to the existence or scope of the investigative duty. For, if plaintiff's estoppel argument is accepted, the mere failure to investigate would eliminate the issue of foreseeability from any action against the Housing Authority to recover for harm caused one tenant by another; the harm would simply be deemed foreseeable because the Housing Authority did not "follow up".

The Housing Authority is not the insurer of its tenants' safety. *(See, e.g., Nallan v Helmsley-Spear, Inc.,* 50 NY2d 507, 519; *Iannelli v Powers,* 114 AD2d 157, 161.) It is under no greater duty to protect its tenants from the possible adverse consequences of their neighbors' physical and mental infirmities than any other landlord. *(See, Waters v New York City Hous. Auth.,* 69 NY2d 225, 228.)

A landlord is, of course, under a duty to take reasonable security measures to protect his tenants from the intentional criminal acts of others if he knows or should know that common areas upon his premises have been the scene of recurrent criminal activity *(Nallan v Helmsley-Spear, Inc.,* 50 NY2d 507, *supra; Miller v State of New York,* 62 NY2d 506). Thus, a landlord's failure to maintain locks *(see, Miller v State of New York, supra)* or to post security personnel at entrances *(see, Nallan v Helmsley-Spear, Inc., supra),* or to provide adequate lighting in places where criminals are known to lurk *(see, Loeser v Hale Gardens,* 73 AD2d 187) may constitute

negligence for which the landlord can be held accountable. And, indeed, this is as it should be because a landlord in his proprietary capacity is responsible for and presumed to be capable of maintaining his premises in reasonably secure and physically safe condition. *(See, Nallan v Helmsley-Spear, Inc., supra,* at 519; *see also,* Prosser and Keeton, Torts § 57, at 386 [5th ed 1984].)* But the landlord in the present case is not being held to account for harm resulting from negligently maintained premises. Rather, defendant is here cast in damages for failing to protect a tenant from harm having as its source the psychiatric condition of a cotenant. Plaintiff's recovery is not premised upon defendant's failure to take relatively minimal steps to fix a lock or install a light fixture, but upon its failure to afford protection of a fundamentally different sort against the possible adverse consequences of one of its tenant's mental illness. This is something which a landlord cannot, in fairness, be called upon to do. A landlord is not competent to assess the dangerous propensities of his mentally ill tenants, nor does he have the resources, or control over his tenants necessary to avert the sort of tragedy presented by this case. *(See, Blatt v New York City Hous. Auth.,* 123 AD2d 591, 592.)

The determination as to whether a mentally ill individual is dangerous or will become dangerous is one which is often difficult for even the most highly trained mental health professionals to make reliably. *(See,* Monahan, *op. cit.)* It is, accordingly, not the sort of determination which landlords, who possess no special expertise in the field of mental health, should be required to make. A mentally ill individual whose behavior gives cause for concern should be evaluated by qualified professionals as permitted by law and treated if necessary. It is not the province of a landlord to perform such an evaluation, nor should the results of such an evaluation be a predicate for a tenant's eviction. Those who suffer from mental illness should, where appropriate, be treated and, if necessary, institutionalized. They should not on the basis of their clinical condition be evicted. *(See,* Executive Law § 290 [2]; § 296 [5] [a] [1], [2].)*

Just as it is not the landlord's province to perform clinical evaluations of his mentally ill tenants, neither is it his province to monitor their condition, or to provide treatment, or even to condition continued tenancy upon the receipt of treatment. Treatment decisions are properly left to authorized mental health providers and their patients. Unless the men-

tally ill tenant is incapable of making an informed decision concerning treatment, it may not be forced upon him, even by his doctor *(see, Rivers v Katz,* 67 NY2d 485), much less by his Housing Authority landlord.

The extent to which plaintiff would have defendant landlord assume the responsibilities of a health provider in fulfilling its "duty to keep its tenants safe" is indeed incredible. Plaintiff actually suggests that the Housing Authority could have dispensed psychotropic medication from its office. One may well inquire what other kinds of medications and therapies the Housing Authority should dispense to keep its tenants safe! In any case, plaintiff urges that "it would have been an easy matter to ensure that Ernest Lamb was handled in such a manner as to substantially reduce his symptoms". Ernest Lamb, aged 23 at the time of the Gill incident, was chronically mentally ill and had been so since midadolescence. Despite numerous hospitalizations and medication regimens, the testimony at trial indicated that his condition over the years remained essentially unchanged. Ernest Lamb's symptoms were apparently highly resistent to treatment. It is truly remarkable then that plaintiff's counsel suggests that the Housing Authority could easily have ensured that Ernest Lamb was handled in such a manner as would have reduced his symptoms. It bears repetition that we are not speaking here of installing a light, fixing a lock or posting a guard; we are talking about a mental illness over whose symptomatology and progress defendant landlord had no control. It is fundamentally unfair and completely contrary to well-established principles of the law of negligence to hold a defendant under a duty to prevent the acts of a third party in these circumstances. *(See, Pulka v Edelman,* 40 NY2d 781, 783-784; *Waters v New York City Hous. Auth.,* 116 AD2d 384, *affd* 69 NY2d 225, *supra; Blatt v New York City Hous. Auth., supra,* at 592-593.)

The only measure which would have prevented the Gill stabbing was Ernest Lamb's eviction. But defendant could not have evicted Lamb because just as there was no factual predicate for a "follow-up" investigation of Lamb, there was also none for the termination of Lamb's tenancy. Plaintiff concedes that defendant could not have evicted Lamb for his mental illness but goes on to say that "he should have been terminated because of what he was likely to *do* as a mentally ill person" (emphasis in original). This, however, reveals a rather basic misunderstanding respecting the grounds upon

which eviction may be sought under the Housing Authority's rules and regulations. Nothing in the defendant's rules and regulations authorizes the termination of a tenancy based solely upon what a tenant, mentally ill or not, is likely to do. Rather, as a careful reading of defendant's governing rules discloses, a tenancy may only be terminated on the ground of a tenant's nondesirability when the tenant has, in fact, done something or engaged in a course of conduct that "is seriously damaging to neighbors or to the housing development" (New York City Hous Auth Mgt Manual, Appendix B, at 4). Thus, it is not upon the mere prospect of future misconduct that a nondesirability eviction proceeding may be premised, but upon misconduct which has actually occurred. Defendant's Management Manual on the Termination of Tenancy (in) Nondesirability Actions, large portions of which were read into the trial record, specifically describes the kinds of tenant behavior warranting commencement of nondesirability proceedings. And it should be noted that even where a tenant's nondesirability is based upon a condition, the condition must have resulted in repeated seriously objectionable behavior. For example:

"A recommendation to terminate tenancy because of *repeated disruptive behavior* may be based upon any one of the following situations * * *

"2. Alcoholism—*where it results in behavior* which disturbs the peace or comfort of other tenants or interferes with the operation of the project." *(Id.,* at 9; emphasis added.)

Although mental illness quite properly is nowhere mentioned as a ground for the termination of a tenancy by defendant, if it were, it is to be expected that the basis for defendant's action would be the tenant's actual misconduct, not his or her condition or propensities.

Defendant could not have evicted Ernest Lamb or his family for what Ernest was "likely to do", and there was no other basis for action by defendant prior to the attack upon plaintiff. Defendant simply had no means at its disposal to prevent the tragedy which occurred, and for this reason, it had no duty to do so. *(Pulka v Edelman, supra; Waters v New York City Hous. Auth., supra; Blatt v New York City Hous. Auth., supra.)* In adopting its nondesirability rules, defendant did not impose upon itself an affirmative duty to protect its tenants from all harm which might be caused them by their neighbors. To the contrary, defendant assumed no more obligation than that of

responding appropriately to reports of past tenant misconduct so as to maintain the general well-being of the Housing Authority project community. It cannot be said that defendant failed to discharge this limited duty in the present case. It did respond appropriately to the one report of tenant misconduct it received about Ernest Lamb in 1976. Thereafter, it had neither the power nor the duty to take further action against Lamb or his family before the Gill stabbing in 1982.

The practical consequences of an affirmance in this case would be devastating. The Housing Authority would be forced to conduct legally offensive and completely unwarranted "follow-ups" of all those tenants within its projects known to have a psychiatric condition possibly, but it must be noted, not foreseeably, injurious to another tenant. Once the "follow-up" had been conducted, the Housing Authority would then be obligated to look into its crystal ball to access the likelihood of harm and then, where indicated, to take protective measures for which it had no expertise or authority. These would include dispensing medication, monitoring treatment, posting warnings (i.e., "Beware of your neighbor"), or evicting tenants. Given the options, eviction, which is described in the Housing Authority Management Manual as a "last resort", would become almost commonplace. Those with psychiatric disorders would be dispossessed from their low-income accommodations to live in the streets. The equally unacceptable alternative would be for the Housing Authority to expose itself to staggering liability.

The incident which gave rise to this action was tragic; a young man was seriously injured through no fault of his own by a deranged cotenant and has, as a result, lost part of the use of one of his arms. But, however much we may wish to see the plaintiff made whole, that is not an end that can be achieved in accordance with the law of negligence. Quite apart from the fact that the harm in this case was not under any reasonable view of the evidence foreseeable by the defendant, there was no duty cognizable at law on defendant's part either in its proprietary capacity or pursuant to its rules and regulations to protect the plaintiff from the harm which befell him. It is hornbook law that there can be no liability for negligence unless there has been a breach of duty by the defendant proximately causing reasonably foreseeable harm to the plaintiff. (*Pulka v Edelman, supra,* at 782; *Boltax v Joy Day Camp,* 67 NY2d 617; *Solomon v City of New York,* 66 NY2d 1026; *Akins v Glens Falls City School Dist.,* 53 NY2d 325, 333;

*Iannelli v Powers,* 114 AD2d 157.) To relax and, indeed, completely ignore these principles in the present case in order to achieve a superficially "happy" result, not only distorts the law of negligence, it creates havoc with the landlord-tenant relationship, imposing upon the landlord unprecedented responsibilities having nothing to do with the proprietary function, and subjecting the tenant to a degree of scrutiny about his private affairs and insecurity about his living accommodation that is intolerable.

Moreover, by arbitrarily requiring a landlord to assume responsibility for the unprecedented acts of a mentally ill tenant over which the landlord has no control, we do little to prevent the sort of harm suffered by plaintiff. The reverse is the case. The mentally ill, forced from their homes because of what a landlord has determined they are likely to do, will decompensate on the streets. No one will be the safer for this.

Accordingly, the judgment of the Supreme Court, Bronx County (Harold Tompkins, J.), entered November 18, 1985, upon a jury verdict for plaintiffs in the amount of $194,972 should be reversed, on the law, judgment should be entered for defendant and the complaint dismissed, without costs.

SANDLER, CARRO, MILONAS and WALLACH, JJ., concur.

Judgment, Supreme Court, Bronx County, entered on November 18, 1985, unanimously reversed, on the law, the judgment vacated, and the complaint dismissed, without costs and without disbursements.