George H. NIESWAND and Patricia A. Nieswand, Administrators and Administrators Ad Prosequendum of the Estate of Erin Nieswand, Deceased; and George H. Nieswand and Patricia A. Nieswand, Individually, Plaintiffs,

v.

CORNELL UNIVERSITY, a corporation organized under the laws of the State of New York, Defendant and Third–Party Plaintiff,

v.

Su Yong KIM, Third–Party Defendant.

No. 86–CV–1234.

United States District Court, N.D. New York.

Aug. 17, 1988.

Rand & Algeier, Morristown, N.J. (Gary C. Algeier, of counsel), for plaintiffs.

Young, Rose & Millspaugh, Roseland, N.J. (Frederick W. Rose, of counsel), Thomas M. Santoro, Associate University Counsel, Cornell University, Ithaca, N.Y., for defendant and third-party plaintiff.

## MEMORANDUM–DECISION AND ORDER

CHOLAKIS, District Judge.

This is a diversity action for personal injury and wrongful death commenced by George and Patricia Nieswand, residents of New Jersey, as administrators of the estate of their daughter Erin and in their individual capacities, against Cornell University, a New York Corporation. The action was originally commenced on May 4, 1984, in the Superior Court of New Jersey, Law Division, Morris County. On June 1, 1984, Cornell removed the action, pursuant to 28 U.S.C. § 1441, to the United States District Court for the District of New Jersey. More than two years later, by Order dated October 3, 1986, the action was transferred to this district.

In September 1983, Erin Nieswand enrolled as a freshman at Cornell University where she shared a room in a dormitory known as North Campus 7 with two other students, Jane Niehaus and Young Hee Suh. During the course of the fall term, Young Hee received love letters and presents from Su Yong Kim who was not a Cornell student. At some point during the semester, Kim came to Cornell and took Young Hee out to dinner. In late October, around Halloween, Kim went to Young Hee's room asking to see her. It appears that Young Hee was no longer interested in Kim and went to the room of Ken Sepe, her resident advisor, and asked him to tell Kim that she was not around. Sepe testified that his offer to have Kim removed was rejected by Young Hee who subsequently left the room to talk with Kim.

In the early evening of Saturday, December 17, 1983, Kim somehow gained access to North 7. The dormitory's doors were supposed to be locked for the weekend. A "Memorandum on Residential Hall Security Policy and Procedures", which was drafted after the incident by Lieutenant Boice of Cornell's Department of Public Safety, did not definitively conclude how Kim gained entry to the dormitory. Among the possibilities is that either the front door or fire escape doors to the suites were not adequately secured or were propped open, that someone let Kim in, or that he simply walked in while a resident either left or entered the dormitory. The deposition testimony of various witnesses conflicts on the exact manner by which Kim entered the dormitory.

Erin saw Kim and left a note on her dormitory room door that Kim was on campus. Young Hee returned to her room at some point after 11:00 p.m. Sitting in the corridor of the suite were other residents of the suite including Diane Nielsen and Melissa Paulson. Kim was apparently down the corridor around the corner. After being informed of Kim's appearance in the suite, Young Hee went into Nielsen's room where she was followed by Nielsen and Paulson and the door was closed.

Young Hee called her roommate, Erin, who was elsewhere on the Cornell campus. Sometime thereafter, Erin, accompanied by Peter Browning, another Cornell student, arrived at and entered Nielsen's room. At some point, Young Hee also phoned David Kang, a Cornell student, and asked him to come to her room and talk with Kim in

Korean. Through an open door, Young Hee conversed with Kim who remained in the corridor. Young Hee returned to her own room to talk with Kim who attempted to close the door behind him. Nieswand, Browning and Paulson entered the room. Nielsen also returned to the suite. Shortly thereafter, Kang arrived.

From an undisclosed location, either on his person or in the suite, Kim suddenly pulled out a rifle and ordered Nielsen and Paulson, who were standing in the doorway, into the room. Kim announced his intention to kill all six persons in the room, Suh, Nieswand, Nielsen, Paulson, Browning and Kang. Sometime thereafter, Jane Niehaus, the third roommate, attempted to enter her room, but was told to stay out by Young Hee.

Kim subsequently allowed Nielsen, Paulson, Browning and Kang to leave the room. Kim refused to permit Erin to leave, apparently because she had allegedly teased him on the phone in the past. Shortly after the four students were released, two series of shots were heard.

Upon entering the room, it was apparent that Young Hee, who was shot three times, was dead. Erin, who was shot twice, was alive and removed to Tompkins Community Hospital. She was subsequently transported to the Upstate Medical Center in Syracuse where she died.

Plaintiffs have brought fifteen separate counts against Cornell arising out of the tragic incident. These counts can be summarized as follows:

Counts I and II Cornell failed to provide adequate security for its students and, in particular, was aware of Kim's anti-social behavior

Counts III and IV Cornell voluntarily assumed the duty to protect students from harm and breached this duty

Count V Cornell's representations of safety and its total and exclusive control of campus security rendered Cornell strictly liable for Erin's death

Count VI Pain and suffering caused by Erin as a result of the breach of duty set forth in the previous counts

Counts VII and VIII Cornell security personnel were unprepared, untrained and unequipped to handle reasonably foreseeable criminal activity and failed to render aid

Counts IX and X Cornell breached a contract existing between it and Erin

Count XI Cornell breached its obligations towards Erin's parents who were third party beneficiaries of Cornell's contract with Erin

Count XII Cornell inflicted emotional distress on Erin's parents by not promptly notifying them of the shooting; by failing to make travel arrangements to Cornell after the incident; and by mailing Erin's grades which included an incomplete grade for two classes

Counts XII, XIV, and XV Punitive Damages

Cornell has brought a third-party action against the convicted murderer, Su Yong Kim.

By its motion, Cornell seeks summary judgment, pursuant to Fed.R.Civ.P. 56(c), on all of plaintiffs' counts. On January 15, 1988, arguments were heard on defendant's motion. In their opposition papers and at oral argument, plaintiffs withdrew the strict liability claim (Count V) and the third-party beneficiary claim (Count XI). At oral argument on this motion, this Court dismissed the infliction of emotional distress claim (Count XII).

Under Fed.R.Civ.P. 56(c), summary judgment will be granted if "the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the moving party, Cornell bears the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986). If this burden is met, plaintiffs are required to set forth specific facts indicating a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274; *see* Fed.R.Civ.P. 56(e). If genuine factual issues exist, they are to be

resolved by the finder of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 213 (1986). All reasonable inferences are to be drawn in favor of the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970).

*Negligence Claims*

Cornell seeks to dismiss Counts I through IV, and VI through VIII on the ground that, as a matter of law, it cannot be held liable for its alleged failure to provide Erin Nieswand with adequate security. Plaintiffs' allegation of negligence is based on two theories of liability: (1) Cornell, as a landowner, failed to provide adequate security and (2) Cornell, by virtue of its relationship with its students, was obligated to provide adequate security.

To prove a case of negligence under New York law, a plaintiff must establish: (1) the existence of a duty on the part of a defendant to plaintiff; (2) defendant's breach of that duty; and (3) an injury proximately caused by the breach. *Boltax v. Joy Day Camp.* 67 N.Y.2d 617, 499 N.Y.S.2d 660, 490 N.E.2d 527 (1986). The question presented by this motion is whether Cornell owed to Erin Nieswand the duty to undertake security or protective measures for the dormitories it operated.

New York law imposes a duty on a landowner to exercise reasonable care under the circumstances to maintain his property in a safe condition. *D'Amico v. Christie*, 71 N.Y.2d 76, 85, 524 N.Y.S.2d 1, 5, 518 N.E.2d 896, 900 (1987); *Basso v. Miller*, 40 N.Y.2d 233, 241, 386 N.Y.S.2d 564, 568, 352 N.E.2d 868, 872, (1976); *Caraballo v. United States*, 830 F.2d 19, 21 (2d Cir.1987). However, a landowner is not an insurer of safety. Instead, a landowner "cannot be held to a duty to take protective measures unless he knows or has reason to know that there is a likelihood of conduct on the part of third persons which would endanger the safety of the visitor." *Nallan v. Helmsley–Spear, Inc.*, 50 N.Y.2d 507, 429 N.Y.S.2d 606, 613, 407 N.E.2d 451, 458 (1980); *see Miller v. State*, 62 N.Y.2d 506, 478 N.Y.S.2d 829, 467 N.E.2d 493 (1984).

Besides foreseeing harm from a particular assailant, however, a landowner can be put on notice if past history of criminal activity indicates that a criminal incident is a significant, foreseeable possibility. *Nallan*, 50 N.Y.2d at 520, 429 N.Y.S.2d at 613, 407 N.E.2d at 458; *Gill v. New York City Hous. Auth.*, 130 A.D.2d 256, 519 N.Y.S.2d 364, 369–70 (1st Dept. 1987). As a result, a college will have breached its duty if it fails to take minimal precautions to protect its students from the reasonably foreseeable acts of third persons. *Miller*, 62 N.Y.2d at 513, 478 N.Y.S.2d at 833, 467 N.E.2d at 497; *See also Nallan*, 50 N.Y.2d at 519, 429 N.Y.S.2d at 613, 407 N.E.2d at 458; *Kush v. City of Buffalo*, 59 N.Y.2d 26, 33–34, 462 N.Y.S.2d 831, 835, 449 N.E.2d 725, 729 (1983); *Iannelli v. Powers*, 114 A.D.2d 157, 498 N.Y.S.2d 377, 380 (2d Dept.), *lv. denied*, 68 N.Y.2d 604, 506 N.Y. S.2d 1027, 497 N.E.2d 707 (1986).

Cornell maintains that there is no evidence that it knew or should have known that Kim would endanger the life of any Cornell student. It refers to the depositions of student witnesses who described Kim as a well-dressed man who never caused a disturbance. In furtherance of its argument, Cornell contends that, in the past and on the night of the tragedy, Young Hee rejected suggestions by certain students to contact the Department of Public Safety and/or the Resident Advisor. Finally, the University's Department of Public Safety has no records of any reported problems with Kim prior to the incident.

Cornell also contends that there is no evidence of an extensive history of criminal conduct on the campus sufficient to impose a duty to provide security for the dorms. It points out that prior to this tragedy there had been no murder or attempted murder in the history of the university. As a result, it maintains that it had no duty, as a matter of law, to provide adequate security. *See, e.g., Iannelli*, 498 N.Y.S.2d 377 (2d Dept.1986) (minor incidents of crime did not put landowner on notice); *Whitney v. State*, Claim No. 65293, slip op. at 5 (Court of Claims, July 19, 1982) (one prior violent incident in the preceding 10 months);

*D'Aquanni v. State*, Claim No. 62627, slip op. at 4 (Court of Claim, September 8, 1980) (three other violent attacks in two years prior to incident).

Plaintiffs have countered by submitting evidence that Cornell was specifically aware of the threat posed by Kim. At his deposition on April 17, 1985, Dr. George Nieswand, Erin's father, testified that either Mr. Paleen or Mr. Daly, Director and Assistant Director of the Department of Residential Halls, respectively, advised him that Kim "had been there on a previous visit and had to be escorted off of the campus by university security." On another occasion, plaintiffs assert that one of the victims, Young Hee Suh, hid in the room of her Resident Advisor, Ken Sepe, in an attempt to avoid Kim.

Plaintiffs have also submitted statistical evidence of the amount of crime which occurred on the Cornell campus during the three school years prior to Erin's death. From 1980–1983, the following crimes were reported: 4 rapes, 8 robberies, 9 assaults, 42 "other assaults", 19 sex offenses, 793 burglaries and 2582 larcenies.

In its Reply Papers, Cornell has attempted to refute plaintiffs' contentions. It has submitted the deposition of Ken Sepe, a Resident Advisor, who testified that although Young Hee did, on one occasion, hide in his room, she left the room to talk to Kim. (Sepe Deposition at 73). He further described Kim as patient and nonviolent. (*Id.* at 69). Cornell has also submitted the testimony of Jane Niehaus, Erin and Young Hee's roommate, who confirmed this view of Kim. (Niehaus Deposition at 8). Niehaus also testified that while she saw Kim in the dorm on consecutive days on a prior weekend, she wasn't sure where he stayed, but guessed he stayed in the lounge. (*Id.* at 9, 13).

In *Miller*, the Court of Appeals held that the State of New York had a duty to take the minimal security precaution of locking a dormitory's doors when it had notice of the likelihood of criminal intrusion. 62 N.Y.2d at 514, 478 N.Y.S.2d at 833, 467 N.E.2d at 497. Notice in that case consisted of nonresidents twice loitering in the

dormitory's lounges and hallway and numerous crimes in the dormitories such as armed robbery, burglaries, criminal trespass, and a rape by a nonstudent.

In *Nallan*, the plaintiff was shot by an unknown assailant while he was registering as a guest in defendant's Manhattan office building. The plaintiff introduced evidence that there were 107 reported crimes in the office building during the 21 months before the shooting, at least 10 of which were crimes against the person. Although there was no proof that any of these crimes occurred within the lobby of the building where the shooting occurred, the Court of Appeals wrote:

> [A] rational jury could have found from the history of criminal activity in the other parts of the building that a criminal incident in the lobby was a significant, foreseeable possibility. If the jury found that defendants knew or had reason to know of the prior crimes in the building and further found that defendants should have anticipated a risk of harm from criminal activity in the lobby, it properly could have gone on to conclude that defendants failed in their obligation to take reasonable precautionary measures to minimize the risk and make the premises safe for the visiting public.

50 N.Y.2d at 520, 429 N.Y.S.2d at 613–14, 407 N.E.2d at 458 (footnote omitted). *See also Sherman v. Concourse Realty Corp.*, 47 A.D.2d 134, 136, 365 N.Y.S.2d 239, 242 (2d Dept.1975).

■ From the evidence submitted, it is apparent that a question of material fact exists as to whether Cornell University could have foreseen the criminal activity in this case so as to give rise to a duty on its part to provide adequate security measures. *See, e.g., Loeser v. Nathan Hale Gardens, Inc.*, 73 A.D.2d 187, 425 N.Y.S.2d 104, 107 (1st Dept.1980).

Cornell raises for the first time in its Reply Papers that it did not breach its duty, even if such a duty existed. However, as noted by the New York Court of Appeals:

> What safety precautions may reasonably be required of a landowner is almost

always a question of fact for the jury. Conceivably, in assessing the reasonableness of the landowner's conduct, the jury might take into account such variables as the seriousness of the risk and the cost of the various available safety measures. *Nallan,* 50 N.Y.2d at 520 n. 8., 429 N.Y.S.2d at 614 n. 8, 407 N.E.2d at 458 n. 8. *See also Kush,* 59 N.Y.2d at 31, 462 N.Y.S.2d at 834, 449 N.E.2d at 728; *Arena v. Ostrin,* 134 A.D.2d 306, 520 N.Y.S.2d 785, 786 (2d Dept.1987).

■ As a separate basis for dismissing these counts, Cornell maintains that no special relationship existed between it and Erin which would give rise to a duty on Cornell's part to provide police protection. New York courts have long recognized the principle that, in the absence of a special relationship, a government entity owes no duty to provide police protection to the public. *See, e.g., Sorichetti v. City of New York,* 65 N.Y.2d 461, 492 N.Y.S.2d 591, 482 N.E.2d 70 (1985); *Riss v. City of New York,* 22 N.Y.2d 579, 293 N.Y.S.2d 897, 898, 240 N.E.2d 860, 861 (1968). This governmental immunity has been extended to cover nongovernmental entities, such as the New York City Transit Authority, which perform a governmental function. *Weiner v. Metropolitan Transp. Auth.,* 55 N.Y.2d 175, 448 N.Y.S.2d 141, 433 N.E.2d 124 (1982).

In *Weiner,* the New York Court of Appeals noted that the Legislature had declared in Public Authorities Law § 1202(2) that the New York City Transit Authority "shall be regarded as performing a governmental function in carrying out its corporate purpose and in exercising the powers granted by this title." *Id.* at 181, 448 N.Y.S.2d at 144, 433 N.E.2d at 126. Furthermore, the court noted that the Legislature authorized the Authority to maintain a transit police force whose members are designated as police officers for purposes of the Criminal Procedure Law, and whose powers, while geographically limited, are just as broad as a municipal police officer.

Cornell maintains that its status is analogous to the transit authority in *Weiner.* It notes that in Education Law § 5709, the Legislature authorized Cornell to maintain a police force whose duties were geographically limited. They were also given the power of peace officers as set forth in the Criminal Procedure Law. Based upon this Legislative enactment, Cornell maintains that it cannot be held liable for failure to provide police protection to Erin.

This Court need not rule on Cornell's argument. The special relationship rule is inapplicable when a purported governmental entity is acting in a proprietary capacity. *Miller,* 62 N.Y.2d at 511, 478 N.Y.S.2d at 832, 467 N.E.2d at 496; *see also Preston v. New York,* 59 N.Y.2d 997, 998, 466 N.Y.S.2d 952, 952–53, 453 N.E.2d 1241, 1241–42 (1983). Plaintiffs' assertion of liability against Cornell is not based upon its alleged failure to provide police protection. Instead, plaintiffs claims are premised on Cornell's status as a landowner in its operation, maintenance, and supervision of its dormitories. *Cf. Marilyn S. v. City of New York,* 134 A.D.2d 583, 521 N.Y.S.2d 485 (2d Dept.1987). In such cases, the purported governmental entity is "held to the same duty of care as private individuals and institutions engaging in the same activity." *Schrempf v. New York,* 66 N.Y.2d 289, 294, 496 N.Y.S.2d 973, 976, 487 N.E.2d 883, 886 (1985). *Cf. Kenavan v. City of New York,* 70 N.Y.2d 558, 523 N.Y.S.2d 60, 517 N.E.2d 872 (1987). As previously discussed, liability will only arise if there has been a failure to exercise reasonable care to prevent or minimize reasonably foreseeable danger. Cornell's motion for summary judgment on plaintiffs' claims of alleged inadequate security is, in all respects, denied.

*Contract Claims*

■ In Counts IX and X, plaintiffs allege that an implied contract was created between Cornell and Erin. This contract allegedly arose out of a series of documents, brochures, leaflets and pamphlets Cornell sent to prospective students and to students accepted for enrollment. In their motion papers, plaintiffs have cited two provisions containing representations which they contend constitute part of this contract. A brochure entitled "Living on

Campus, Cornell University 1983–84" contains, on page 19 under the heading "Policy", the following representation:

> **Security.** Concern for personal safety and security of property is shared by all segments of the University community. The Department of Residence Life provides facilities and programs that reflect this concern. Each building is locked during the evening and night, and periodic personal security programs are offered within the residence areas.
>
> The ultimate responsibility for personal security, however, rests with each resident. Complying with security measures and reporting incidents immediately will greatly assist in making the residence halls secure. The Department of Residence Life, on behalf of all residents of the halls, asks you to cooperate in this effort.

Furthermore, the "Residence Hall Policy and Safety Procedures, 1983–84" provides:

> **Security**
>
> Personal safety and security at Cornell are both community and individual responsibilities. The Department of Residence Life maintains facilities and programs that reflect this concern and that assist residents of the living units in providing for their own security. Each building is locked at night and kept locked until early morning, and personal security programs are periodically offered in the residence areas.
>
> The ultimate responsibility for personal security is that of each resident. If you follow the procedures listed below and immediately report any incidents, you will help make the residence halls secure:
>
> 1. Lock your room whenever you leave it, even for a few minutes.
>
>    .    .    .    .    .
>
> 5. Do not prop open outside exit doors when they should be locked.
>
>    .    .    .    .    .
>
> 9. Report suspicious behavior or individuals to the Department of Public Safety immediately (dial 6–1111 or use a Blue Light telephone).

Cornell first asserts that no contract exists between it and Erin. It cites a number of cases in which the courts have refused to recognize a contractual obligation based upon provisions in college booklets, etc. *See, e.g., Lyons v. Salve Regina College,* 565 F.2d 200 (1st Cir.1977). Of the cases cited by Cornell, however, only one is based upon New York contract law.

In *Drucker v. New York Univ.,* 57 Misc. 2d 937, 293 N.Y.S.2d 923 (N.Y.Civ.Ct.1968), *rev. on other grounds,* 59 Misc.2d 789, 300 N.Y.S.2d 749 (Sup.Ct.App.Term 1969), *aff'd,* 33 A.D.2d 1106, 308 N.Y.S.2d 644 (2d Dept.1970), a student paid his tuition to a dentistry school. A few days later, plaintiff sought a refund after deciding to attend medical school instead. The dentistry school refused to pay a refund on the ground that its Bulletin, a informational booklet for students, stated that no refunds would be given. The court noted that

> to charge the plaintiff with the acceptance of the contents of a *Bulletin,* 55 pages in length, is a fiction and contrary to today's practice and usage. Before plaintiff could be specifically bound by the thousands of words of print in the *Bulletin,* defendant should have given reasonable notice to the plaintiff of the salient sections of its contents and plaintiff would have had to have given assent thereto.... A mere or casual mailing of the *Bulletin* to the plaintiff should not satisfy the requirements necessary to make its contents binding in the form of a contractual undertaking or obligation.

*Id.* 293 N.Y.S.2d at 928 (citations omitted).

The present case is readily distinguishable from *Drucker* for the simple reason that, in our case, it is the student, and not Cornell, who is seeking to enforce the provisions of these documents. Unlike the situation in *Drucker* where a contract was not found because there was no showing that the student assented or even had knowledge of the Bulletin's provisions, the plaintiffs are seeking to hold Cornell to the terms of its own materials.

Numerous courts in New York have recognized that once a student is admitted to a university, an implied contract can arise

between the student and the university. *See, e.g., Vought v. Teachers College, Columbia Univ.,* 127 A.D.2d 654, 511 N.Y.S. 2d 880 (2d Dept.1987); *New York v. Fenton,* 68 A.D.2d 951, 414 N.Y.S.2d 58 (3rd Dept.1979); *Eden v. Bd. of Trustees of State Univ. of New York,* 49 A.D.2d 277, 374 N.Y.S.2d 686 (2d Dept.1975); *Carr v. St. John's Univ., New York,* 17 A.D.2d 632, 231 N.Y.S.2d 410 (2d Dept.), *aff'd,* 12 N.Y.2d 802, 235 N.Y.S.2d 834, 187 N.E.2d 18 (1962). "The rights and obligations of the parties, as contained in the university's bulletins, become a part of the parties' contract." *Prusack v. State,* 117 A.D.2d 729, 498 N.Y.S.2d 455, 456 (2d Dept.1986); *see also Auser v. Cornell Univ.,* 71 Misc.2d 1084, 337 N.Y.S.2d 878 (Sup.Ct.Tompkins County 1972).

None of the cases addressing the issue of an implied contract between student and university involve facts remotely similar to the present case. For the most part, these cases involve students seeking monetary refunds of tuition, *see, e.g., Prusack,* 498 N.Y.2d at 456; *Auser,* 337 N.Y.S.2d at 882, or enforcement of post graduation guarantees of employment, *see, e.g., Stad v. Grace Downs Model and Air Career School,* 65 Misc.2d 1095, 319 N.Y.S.2d 918 (N.Y.Civ.Ct. 1971). Cornell expresses a concern that if the language set forth in its bulletins is given a construction as desired by plaintiffs, it would, in effect, be a "guaranty of security". Contrary to this suggestion, it is apparent that, by these provisions, Cornell only assured that each building would be locked at night and that periodic security programs would be offered. It also made clear, however, that its students had certain obligations to maintain adequate security.

Finally, Cornell raises for the first time in its Reply Papers, that if it had a contractual duty to provide security then Erin had a similar duty, under the same provisions, to report suspicious behavior to the Department of Public Safety and to refrain from propping open the outside doors with soda cans. Because Erin allegedly breached this obligation, Cornell maintains that she cannot now recover against Cornell for breach of contract.

From the deposition testimony submitted by the parties, it is apparent that a question of fact exists as to whether either party failed to meet his or her obligations under the contract. Plaintiffs have submitted the testimony of numerous students and staff members who testified that the problem of propped open doors was well known. Despite this alleged knowledge, plaintiffs contend that the University failed to take steps to resolve the problem. Cornell has countered that Erin herself propped open the doors. Based upon these conflicting contentions, a question of fact exists. Cornell's motion for summary judgment on plaintiff's claims for breach of contract is, in all respects, denied.

In sum, after a review of the entire file in this matter, Cornell University's motion for summary judgment is denied in so far as it seeks dismissal of Counts I through IV, VI through X, and XII through XV. The emotional distress claim (Count XII) is dismissed for the reasons stated at the oral argument of this motion on January 15, 1988. Finally, Counts V and XI are dismissed on the consent of the parties.

IT IS SO ORDERED.