*291 OPINION OF THE COURT
Chief Judge Wachtler.
Claimant’s husband was stabbed and killed by Joseph Evans, a mental patient who had been released from a State institution and was still receiving outpatient care from that facility. In a suit for wrongful death the Court of Claims found the State liable for negligently failing to have the assailant committed as an inpatient sometime prior to the assault. The Appellate Division affirmed, with one justice dissenting.
On this appeal, the State of New York urges that the claim be dismissed for two reasons. First, it argues that the State cannot be held liable for failure to prevent a criminal act unless it had a special relationship with the victim, which concededly was not proven in this case. Second, it is urged that the decisions of the State psychiatrist fell within the area of professional medical judgment and thus cannot serve as a basis for a negligence or malpractice award. For the reasons that follow, we agree with the State’s second contention and reverse the Appellate Division’s order.
In December 1981 claimant’s husband, Albert Schrempf, was employed at Consolidated Industries of Greater Syracuse, Inc., a private nonprofit organization which provides vocational rehabilitation for outpatients from mental institutions. On December 9, 1981 he was stabbed to death at his place of employment by Joseph Evans, a 27-year-old outpatient from Hutchings Psychiatric Institute, a State mental facility.
Evans had been admitted for treatment at Hutchings on six occasions beginning in May 1979. The admissions usually followed violent altercations with members of his family and involved some property damage and attempted assaults, but not the infliction of personal injury. On these occasions he claimed that he was prompted by inner voices commanding him to act. He was generally diagnosed as a manic depressive hypomanic type or, more rarely, as a paranoid schizophrenic, which were described at trial as degrees of the same general condition. Three of the admissions involved commitments as an inpatient; three were on outpatient status. Several of the admissions were voluntary. Evans generally resented the involuntary commitments and sometimes responded with threats against staff members or resorted to violent resistance. On one occasion, he broke the jaw of another patient.
Evans’ condition was generally improved or stabilized by psychotherapy and medication which could be provided on an *292 outpatient basis. However, he was a difficult outpatient because he had an erratic attendance record and did not regularly take prescribed medications. He was sensitive to, and had an adverse reaction to, certain drugs and sometimes stated that he would not take his medication because it was against his religion.
Evans’ last involuntary commitment as an inpatient ended in January of 1981. In the summer of that year, he broke windows in his mother’s house and subsequently pleaded guilty to criminal mischief. He was sentenced to probation and his probation officer suggested that he seek psychiatric treatment.
On September 28, 1981 he returned to Hutchings and was voluntarily admitted. He was examined on that occasion by the psychiatrist who had first admitted him in 1979 and who had also treated him on most of his subsequent admissions. She found that he was experiencing "persecutory delusions” that he was possessed and might be changing into a homosexual. However, she noted that he was calm and remained cooperative. Based on the examination and her knowledge of his psychiatric history, she determined that he was again suffering from manic depression and that at that time he did not pose a risk to himself or others. She placed him on outpatient status but assigned him to a special clinic for recalcitrant outpatients so that his use of the medication could be monitored.
In October Evans worked at a part-time job, without apparent incident. In November he was referred by his probation officer to Consolidated Industries for vocational rehabilitation. He participated in that program on a trial basis for approximately 10 days over the next three or four weeks.
Throughout this period his participation in the outpatient program diminished. In October he said he did not want to come any more because he had a job. He rarely met with his psychiatrist in October and did not see her after November 1. He did not regularly go to the clinic for his medication in October, and in November only appeared on two dates, November 9 and November 30.
His psychiatrist encouraged him to continue in the outpatient program and to take his medication. When he complained that the drugs made him drowsy at work, she reduced the dosage and directed him to take the medicine at night. On November 17 she informed his probation officer that he was *293 not taking his medication. She also monitored his behavior through the probation officer and others and found no evidence that his condition was deteriorating. On the contrary, she was informed that he appeared to be polite and cooperative by all who observed him at the clinic, the probation office and Consolidated Industries. Indeed he was being considered for permanent membership at Consolidated at the time of the assault on December 9, 1981.
At the trial, the claimant urged that the State had been negligent in the care and treatment of Evans by releasing him and permitting him to remain on outpatient status in 1981, particularly after his psychiatrist had reason to believe he was not taking his medication as prescribed. The Court of Claims held that the decision to release Evans in January 1981 involved a medical judgment for which the State could not be held liable. However, the court concluded that the State was negligent in admitting Evans to outpatient care, instead of confining him as an inpatient in September 1981. The court also held that the State psychiatrist should have done "something more” when it became evident that the patient was not taking his prescribed medication.
The Appellate Division affirmed, without opinion. One justice dissented on the ground that the State, if negligent, should not be held liable for the assault on a third party under the facts of this case (107 AD2d 1042).
The claim should have been dismissed. As noted, the State’s first contention on this appeal is that the claim should have been dismissed because the claimant failed to establish a special relationship between the State and the injured party. The claimant concedes that such a relationship was not established, but argues that it is not necessary where it is alleged that the State’s negligent care and treatment of a mental patient has resulted in injury to a third party.
The State’s argument is based on the basic principle that the State cannot be held liable for negligent failure to perform governmental activities, such as providing police and fire protection or law enforcement generally, unless a special relationship had been established between the State and the person injured (De Long v County of Erie, 60 NY2d 296; O’Connor v City of New York, 58 NY2d 184; Weiner v Metropolitan Transp. Auth., 55 NY2d 175; Garrett v Town of Greece, 55 NY2d 774; Riss v City of New York, 22 NY2d 579). It is *294 urged, that this principle is applicable here because the essence of the complaint is the State’s negligent failure to prevent Evans from criminally assaulting claimant’s husband. The rule, however, has no application in cases where the State engages in a proprietary function (Miller v State of New York, 62 NY2d 506; Bass v City of New York, 38 AD2d 407, affd no opn 32 NY2d 894), such as providing medical and psychiatric care (see, Riss v City of New York, supra, at pp 581-582). In those cases, the State is held to the same duty of care as private individuals and institutions engaging in the same activity (Miller v State of New York, supra, at p 511; Bernardine v City of New York, 294 NY 361; Court of Claims Act § 8; see also, Koenigsmark v State of New York, 55 NY2d 928; Cohen v State of New York, 51 AD2d 494, affd 41 NY2d 1086; St. George v State of New York, 283 App Div 245, affd no opn 308 NY 681; Daley v State of New York, 273 App Div 552, affd no opn 298 NY 880).
This latter standard has been consistently applied in cases where it is alleged that negligent care of a mental patient by the State or one of its subdivisions has produced injury to the patient or others (Koenigsmark v State of New York, supra, [attempted suicide by patient after escape]; Centeno v City of New York, 40 NY2d 932, affg on Per Curiam 48 AD2d 812 [suicide by patient after release]; Cameron v State of New York, 37 AD2d 46, affd no opn 30 NY2d 596 [assault on others after release]; Hirsch v State of New York, 8 NY2d 125 [suicide by patient in hospital]; Scolavino v State of New York, 297 NY 460 [assault on another patient]; Bell v New York City Health & Hosps. Corp., 90 AD2d 270 [patient suicide after release]; Homere v State of New York, 48 AD2d 422 [assault on others after release]; Curley v State of New York, 148 Misc 336, affd sub nom. Luke v State of New York, 253 App Div 783 [assault on visitor]; cf. Excelsior Ins. Co. v State of New York, 296 NY 40). "The State has frequently been held liable for the consequences of its breach of duty to protect others from the acts of the mentally ill confined to State institutions (Scolavino v. State of New York, 297 N. Y. 460; Weihs v. State of New York, 267 App. Div. 233; Jones v. State of New York, 267 App. Div. 254; Joachim v. State of New York, 180 Misc. 963; Curley v. State of New York, 148 Misc. 336, affd. sub nom. Luke v. State of New York, 253 App. Div. 783, and see Martindale v. State of New York, 269 N. Y. 554; Dow v. State of New York, 183 Misc. 674). In such cases, where the confinement is not in the nature of punishment, but rather of *295 restraint and, where possible, cure, there is both a duty to the inmate to provide him with reasonable rehabilitational conditions under the circumstances and to the outside public to restrain the dangerous, or potentially dangerous, so that they may not harm others.” (Williams v State of New York, 308 NY 548, 554-555.) This duty has been recognized, not only in cases where the State has been negligent in permitting a mental patient to escape (Koenigsmark v State of New York, supra; Higgins v State of New York, 24 AD2d 147; Weihs v State of New York, 267 App Div 233; Jones v State of New York, 267 App Div 254; cf. Excelsior Ins. Co. v State of New York, supra), but also when it has been negligent in discharging a mental patient (St. George v State of New York, supra; Taig v State of New York, 19 AD2d 182; Cameron u State of New York, supra; Homere v State of New York, supra), or releasing him to outpatient care (Bell v New York City Health & Hosps. Corp., supra; Statini v State of New York, 202 Misc 689).
A physician’s duty is to provide the level of care acceptable in the professional community in which he practices (Toth v Community Hosp., 22 NY2d 255). He is not required to achieve success in every case and cannot be held liable for mere errors of professional judgment (Pike v Honsinger, 155 NY 201; DuBois v Decker, 130 NY 325). The "line between medical judgment and deviation from good medical practice is not easy to draw” particularly in cases involving psychiatric treatment (Topel v Long Is. Jewish Med. Center, 55 NY2d 682, 684).
Although in the past, the care of those suffering from mental infirmities was generally limited to confinement, the modern and more humane policy of the medical profession and the law contemplates returning the mental patient to society, if he does not pose an immediate risk of harm to himself or others (Excelsior Ins. Co. v State of New York, supra, at p 46; cf. Matter of Torsney, 47 NY2d 667). This, we have noted, requires a sensitive appraisal of competing interests: "(1) the State’s duty to treat and care for its mental defective wards, with an eye toward returning them to society more useful citizens, and (2) the State’s concern that the inmates in its institutions cause no injury or damage to the property of those in the vicinity.” (Excelsior Ins. Co. v State of New York, supra, at p 46). Because psychiatry is not an exact science, decisions with respect to the proper course of treatment often involve a calculated risk and disagreement among experts as to whether the risk was warranted or in accord *296 with accepted procedures (Taig v State of New York, 19 AD2d 182 [Bergan, J.], supra; see also, Centeno v City of New York, supra). These circumstances necessarily broaden the area of professional judgment to include treatments tailored to the particular case, where the "accepted procedure” does not take into account factors which the treating physician could reasonably consider significant (Topel v Long Is. Jewish Med. Center, 55 NY2d 682, supra; Centeno v City of New York, supra; Taig v State of New York, supra; see also, Fiederlein v New York City Health & Hosps. Corp., 80 AD2d 821, affd 56 NY2d 573).
In the case now before us, the Court of Claims concluded that the State should have admitted Evans as an inpatient when he presented himself for treatment in September 1981, and that the failure to do so constituted a departure from accepted medical practice. The court recognized that one of the claimant’s experts rejected that view, but felt that the claimant’s other expert, Dr. Goldfarb, supported it. Although Dr. Goldfarb stated at one point that that was his opinion, he unequivocally stated in his subsequent testimony that he did not consider the treating physician’s decision to be wrong or negligent and that he was simply proposing an alternative. Because all of the experts agreed that the decision to place Evans on outpatient status in September 1981 was either proper or consistent with accepted standards of practice, the court’s findings that this constituted negligence cannot stand.
The only remaining question is whether the treating physician was negligent in failing to intervene in some manner once she had reason to believe that Evans was not taking his medication as prescribed. In view of the fact that Evans was a voluntary outpatient, the State’s control over him, and consequent duty to prevent him from harming others, is more limited than in cases involving persons confined to mental institutions. Even the claimant’s experts did not agree as to what should and could be done with such a patient. They variously proposed compelling or coercing him to resume medication, changing the medication to a drug with longer lasting effects, conducting a full reexamination of him, initiating involuntary commitment proceedings or threatening him with commitment if he did not cooperate. The court held that the treating psychiatrist should have done "something more”, and suggested that "at the very least, an in-depth psychiatric evaluation should have been conducted to determine Evans’ *297 level of functioning.” The court did not indicate what should have been done had Evans refused to cooperate.
One point on which all the experts agreed was that the patient’s failure to take his medication did not necessarily mean that his condition was deteriorating or that he would become dangerous. That would largely depend on his behavior and, again, there was agreement that his outward appearance and behavior did not show any "warning signs” indicative of this kind of change. Although claimant’s experts ignored or discounted these factors, they played a significant role in the attending physician’s assessment. They indicated to her that there was a chance that his condition was improving as it appeared to be, and suggested a corresponding risk that intervention by resort to aggressive measures might disrupt the process. As noted, she knew from past experience that he resented involuntary treatment and often responded violently in that setting. Thus, there were risks either way. The treating physician, as she testified at trial, simply attached greater significance to those factors which seemed most promising and chose the course which appeared to offer the best opportunity for long-term rehabilitation. We know with hindsight that it was a mistaken impression. However, under the circumstances, it must be recognized as an exercise of professional judgment for which the State cannot be held responsible.
Accordingly, the order of the Appellate Division should be reversed and the claim dismissed.
Judges Jasen, Meyer, Kaye, Alexander and Titone concur; Judge Simons taking no part.
Order reversed, with costs, and claim dismissed.