The decision and order of this Court entered herein on January 27, 2011 (80 AD3d 536 [2011]) is hereby recalled and vacated (*see* 2011 NY Slip Op 71518[U] [2011] [decided simultaneously herewith]).

■ JILL WILLIAMS et al., Appellants, v STATE OF NEW YORK, Respondent. [924 NYS2d 23]—

·Judgment of the Court of Claims of the State of New York (Alan C. Marin, J.), entered June 10, 2009, after a nonjury trial,

dismissing the claim, reversed, on the law and the facts, without costs, the claim reinstated, liability on the part of the State is found, and the matter remanded for a trial on the issue of damages.

The issue in this case is proximate cause: Where defendant allows a voluntary mental patient to "elope" from its facility, can that defendant be liable for an assault that the patient perpetrates two years later? Given the extensive history of extreme and consistent violence the patient in this case exhibited, we answer that question in the affirmative.

On July 25, 1993, Tony Joseph, a voluntary mental patient at Manhattan Psychiatric Center (MPC), eloped from the facility for the eighth time in a 29-month period. Joseph, who required an escort on the facility's grounds, eloped when his escort permitted him to use a bathroom out of her sight, in violation of proper procedure for an escorted patient. When Joseph did not return, defendant classified him as on "LWOC" (leave without consent) as opposed to an "escape." In the case of an escape, the police must receive notification. Police notification is not necessary for an LWOC.

Joseph had a history of assaultive behavior, including convictions for attempted assault in the second degree and assault in the second degree. Starting in 1977, Joseph was hospitalized in various state psychiatric facilities. He was in and out of those facilities and often eloped from them. Joseph's extensive history of mental illness in particular included violence against women. On September 26, 1982, he was arrested for assaulting a woman and her infant son. Joseph repeatedly struck the woman in the groin and the child in the face and head. In January 1983, Joseph was admitted as a patient at an Office of Mental Health (OMH) facility. There, he had a history of altercations with other patients. A year later, he was discharged, but he returned to a different OMH facility the following month (February 1984). In 1984 and 1985, Joseph moved around among a few different facilities. In connection with his plea in the 1982 assault, Joseph was required to enter an MPC facility and remain there until discharged. But, on December 6, 1985, while he was at MPC, two physicians determined that Joseph should be involuntarily committed.

On April 8, 1986, Joseph jumped over a half-door in the nurse's station at MPC and attacked a ward nurse so badly that she sustained a concussion. A report following the attack noted that Joseph's doctor stated that Joseph was in a psychotic state of mind at the time of the attack and could not be held accountable for his actions. A clinical summary from the same time pe-

riod stated that Joseph had no control over his aggressiveness and noted that he had been placed in seclusion at times because he was dangerous to other patients. On May 29, 1986, Joseph was transferred to a different facility.

On June 30, 1986, Joseph was indicted for assault in the second degree based on his attack on the nurse at MPC. On July 14, 1987, he was convicted of assault in the second degree after a trial, and was sentenced on August 20, 1987 to a term of two to four years. He was initially sent to Fishkill Correctional Facility, but was soon transferred to an OMH facility.

On December 25, 1987, Joseph threatened to kill staff members at the OMH facility. On January 28, 1988, he was transferred to Clinton Correctional Facility, where he was hostile and threatening to staff members, especially females.

In 1989, Joseph was admitted to MPC on an involuntary basis. On November 16, 1989, he threatened female staff members. On November 20, 1989, he reportedly wanted to attack another patient for no apparent reason. Various notes from this time period indicate that Joseph had a history of hospitalizations due to "assaultive behavior," primarily directed at women, and that he was aggressive and threatening. At some point, his doctors formulated a plan for Joseph that involved addressing his assaultive behavior toward females, improving his self-acknowledgment of his illness, and encouraging him to continue his medications. However, Joseph left MPC without consent in September 1990, and the plan for him was abandoned.

On June 5, 1991, police officers brought Joseph to St. Luke's Hospital in Manhattan after he tripped a woman on the street, knocked her pizza out of her hand and punched a store window. He was transferred from St. Luke's to MPC on July 23, 1991. On September 25, 1991, a two physician certification was prepared to keep him at MPC involuntarily.

Notes dated November 9, 1991 indicate that Joseph was agitated and hit a nurse while she attempted to give him new medication. A January 8, 1992 note indicates that Joseph was involved in a physical altercation.

Although Joseph's last admission to MPC was via a court retention order pursuant to Mental Hygiene Law § 9.33, defendant later converted Joseph from involuntary to voluntary status. In April of 1993, defendant granted Joseph escorted grounds privileges. As noted earlier, on July 25, 1993, Joseph escaped from defendant's care when his escort permitted him to use a bathroom out of her sight, in violation of proper procedure.

On July 7, 1995, while on the street in Manhattan, Joseph

threw a large glass bottle at claimant Jill Williams's leg, causing multiple fractures of her right tibia and requiring her to undergo two surgeries. The police apprehended Joseph, who was later convicted of assault in the first degree. He received a sentence of 4 to 8 years. Aside from an arrest on March 14, 1995, after which he pleaded guilty to criminal trespass, there is no evidence of Joseph's activities during the time between his 1993 elopement and his 1995 assault on claimant.

It is well settled that "[w]here the State engages in a proprietary function, such as providing medical and psychiatric care . . . [it] is held to the same duty of care as private individuals and institutions engaging in the same activity" (*Schrempf v State of New York*, 66 NY2d 289, 294 [1985] [citations omitted]). "[T]here is both a duty to the inmate to provide him with reasonable rehabilitational conditions under the circumstances and to the outside public to restrain the dangerous, or potentially dangerous, so that they may not harm others" (*id.* at 295 [internal quotation marks omitted]). "The State has frequently been held liable for the consequences of its breach of duty to protect others from the acts of the mentally ill confined to State institutions" (*id.* at 294 [internal quotation marks omitted]). While the concept of proximate cause can be difficult to define, in general, "[t]o carry the burden of proving a prima facie case, the plaintiff must . . . show that the defendant's negligence was a substantial cause of the events which produced the injury" (*Derdiarian v Felix Contr. Corp.*, 51 NY2d 308, 315 [1980]).

Here, there is no doubt that defendant's carelessness in supervising Joseph was the proximate cause of claimant's injuries. Joseph had an extensive and consistent history of assaults, particularly against women, including two physical altercations while institutionalized in the two years prior to his escape. Defendant was clearly on notice of Joseph's history and violent tendencies. It was defendant's negligent supervision of Joseph that allowed him to escape. Moreover, at trial, claimants' psychiatric expert testified that, based on his review of Joseph's records, it was virtually guaranteed that Joseph would decompensate and become violent after his elopement. The record amply demonstrates that MPC and OMH were familiar with Joseph's history of violence as well as his many elopements from psychiatric facilities. MPC was also well aware that Joseph had a chronic mental illness, and was aggressive and violent and prone to engage in "assaultive behavior" directed mostly at women. However, despite Joseph's long history of violence, defendant not only created

the opportunity for Joseph to escape from its care, but also, by classifying him as LWOC, absolved itself of the obligation to notify the police that a dangerous, violent and mentally unstable individual was loose somewhere in New York City. Thus, we find that the consequences that resulted in this case from failing to escort Joseph to the bathroom were foreseeable and the element of proximate cause satisfied (see Rattray v State of New York, 223 AD2d 356 [1996]).

While defendant speculates that there could be many intervening factors or acts that occurred between the time of Joseph's elopement and the assault on claimant, it offered no evidence of any intervening factors or acts. Further, we note that "a mere lapse of time, no matter how long[,] is not sufficient to prevent [an actor's conduct] from being the legal cause of the other's harm" (Alvarez v Telemechanics, Inc., 307 AD2d 304, 305 [2003] [internal quotation marks and citation omitted]; see also T.W. v City of New York, 286 AD2d 243, 246 [2001]). Thus, as here, proximate cause may be found long after the negligent act occurs (see Steel v State of New York, Ct Cl, Jan. 15, 2003, Marin, J., UID No. 2003-016-500, affd 11 AD3d 673 [2004]).

The dissent correctly notes that Joseph's status was that of a voluntary patient at the time of his elopement and that he had escorted grounds privileges. The dissent credits this, and the fact that defendant classified Joseph as an LWOC, to conclude that at the time he escaped, Joseph was not in a decompensated psychiatric condition and was not a danger to himself and others. The dissent also relies on defendant's expert who speculated that Joseph's conversion to voluntary status was part of a plan eventually to integrate Joseph back into society. The dissent concludes that it is therefore speculative to assume that he would still have been at MPC in July 1995.

However, it is the conclusions the dissent reaches that are speculative. OMH's policy manual paragraph D (3) (a) (i) provides: "[M]issing patients on voluntary admission status who are subsequently located shall not be returned to a State operated psychiatric facility if they object . . . unless they meet the criteria for an involuntary form of admission. If such criteria are met, involuntary admission shall be pursued." Accordingly, had defendant located Joseph, under this provision he would have returned to the facility if either he did not object or he met the criteria for an involuntary admission. Thus, as a voluntary patient, Joseph was not simply free to walk away from the facility. Had defendant found him, it may have conducted a psychiatric evaluation to determine the propriety of releasing him. It is possible that upon evaluation, Joseph would have been

remanded to involuntary status. But we do not know what Joseph's status would have been because he did not remain under defendant's treatment. Further, a properly discharged patient receives several kinds of support that give him or her the greatest chance of avoiding rehospitalization. These include a residence, a medication arrangement, therapy and someone to monitor his or her progress.

Nor do we know what level of sanity Joseph could have achieved from "a well-planned treatment plan." The reason we do not know this is because defendant's lack of due care allowed Joseph to abscond from MPC before he could finish any treatment plan. We appreciate the dissent's concern about rendering the State "answerable in perpetuity for [the] criminal and tortious conduct [of Joseph]." However, under *Schrempf v State of New York* (66 NY2d 289 [1985], *supra*), the State has a duty to protect the public from persons whose mental illness renders them dangerous. Given Joseph's history, it was a near certainty that he would attack someone, most likely a woman. There is nothing in the record to support the possibility that an intervening event was the proximate cause. The bottom line is, had defendant not allowed Joseph to abscond, plaintiff would not have been injured. Concur—Moskowitz, Manzanet-Daniels and Román, JJ.

Andrias, J.P., and DeGrasse, J., dissent in a memorandum by Andrias, J.P., as follows: After trial, the Court of Claims found that "the failure to prevent [Tony] Joseph from sneaking out of [the Manhattan Psychiatric Center (MPC)] on July 25, 1993 . . . does not support a legal nexus to his assault on [claimant Jill] Williams nearly two years later." The majority disagrees and finds for claimants on the issue of liability. Because I believe that a fair interpretation of the evidence, including the expert testimony, supports the Court of Claims' determination that Joseph's assault on Ms. Williams was too remote in time to be proximately caused by the State's negligence in allowing him to elope almost two years earlier (*see Watts v State of New York*, 25 AD3d 324 [2006]), I respectfully dissent and would affirm the judgment dismissing the claim.

Joseph was first hospitalized at a psychiatric facility operated by the State through the Office of Mental Health (OMH) in July 1977. He was subsequently discharged to the custody of his father, who resided on Riverside Drive. On September 26, 1982, Joseph assaulted a mother and her infant son in that neighborhood. Found unfit to stand trial, he was committed to OMH facilities. On September 12, 1985, Joseph pleaded guilty to attempted assault in the second degree and was sentenced to five

years' probation. As a condition of the plea, Joseph was to enter MPC on Wards Island and remain there until discharged.

On April 8, 1986, Joseph assaulted a female nurse at MPC. A clinical summary prepared after the event indicates that Joseph had been involved in several unprovoked attacks on other patients while hospitalized. On July 14, 1987, he was convicted, after trial, of assault in the second degree, and sentenced to 2 to 4 years. After going back and forth between prisons and OMH facilities, where he engaged in threatening behavior towards staff members, especially females, on April 5, 1989, Joseph applied for a conditional release to parole supervision and was admitted to MPC on a two-physician certification.

Between April 5, 1989 and April 3, 1990, Joseph eloped five times from MPC, sometimes returning to his father. Each time, Joseph was placed on "leave without consent" (LWOC), and was returned to MPC, usually within a few days, as follows:

| Date of Elopement | Date of Return |
| --- | --- |
| August 21, 1989 | August 24, 1989 |
| September 21, 1989 | September 25, 1989 |
| November 13, 1989 | November 14, 1989 |
| February 4, 1989 | February 5, 1989 |
| February 24, 1990 | April 3, 1990 (readmitted) |

At some point, a plan for Joseph was formulated, but it was abandoned after he eloped from MPC on August 9, 1990 and was again placed on LWOC status. On June 5, 1991, Joseph tripped a woman in the street and was brought to St. Luke's Hospital in Manhattan by police officers. On July 23, 1991, he was transferred back to MPC pursuant to a Mental Hygiene Law § 9.33 retention order.

On September 25, 1991, a two-physician certification was prepared for Joseph's involuntary retention at the MPC. On February 14, 1992, he eloped and was classified LWOC. Due to threatening behavior towards his father, Joseph was placed in Harlem Hospital. On January 5, 1993, he was transferred back to MPC, where he was soon converted from involuntary to voluntary status. In April of 1993, Joseph was granted escorted grounds privileges.

On July 25, 1993, Joseph was on an escorted visit to the chapel on hospital grounds and "sneaked out" when his escort permitted him to use a bathroom out of her sight. Staff members and safety officers searched Wards Island for Joseph but did not find him. As in the past, MPC classified Joseph as LWOC as op-

posed to placing him on "Escape" status.[1] Joseph did not return to OMH custody before injuring Ms. Williams, and MPC administratively discharged him on November 1, 1994.

On July 7, 1995, Joseph threw a bottle at Ms. Williams as she was waiting to cross Riverside Drive. A police officer arrested him and took Ms. Williams to the hospital.[2] Although claimants do not challenge the professional decision to grant Joseph escorted grounds privileges, they allege that the State was negligent in allowing Joseph, who was known to the State to be violent and dangerous to other persons due to his mental illness, to elope in violation of proper procedure.

"[W]hen the State acts in a proprietary capacity as a landlord, it is subject to the same principles of tort law as is a private landlord" (*Miller v State of New York*, 62 NY2d 506, 511 [1984]). Accordingly, "a public entity may not escape liability for negligent acts which it performs in a proprietary capacity and which are a proximate cause of an injury which was sustained as the result of a foreseeable act by a third party" (*Marilyn S. v City of New York*, 134 AD2d 583, 584 [1987], *affd* 73 NY2d 910 [1989]; *see generally Derdiarian v Felix Contr. Corp.*, 51 NY2d 308, 315 [1980] ["Where the acts of a third person intervene between the defendant's conduct and the plaintiff's injury . . . liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence"]). "[W]hether an act is foreseeable and the course of events normal are questions which are generally subject to varying inferences presenting issues for the fact finder to resolve" (*Lynch v Bay Ridge Obstetrical & Gynecological Assoc.*, 72 NY2d 632, 636 [1988]).

Providing psychiatric care is a proprietary function (*see Schrempf v State of New York*, 66 NY2d 289, 294 [1985]), and the State has been held liable for negligently permitting a mental patient to escape (*see Rattray v State of New York*, 223 AD2d 356 [1996]). However, even if the State had a duty to claimants and was negligent in allowing Joseph to elope, claimants must establish that the State's negligence was a proximate cause of the injuries Ms. Williams sustained when

1. Under section QA-520 of the OMH Official Policy Manual, in 1993, a patient's leaving was classified as an "Escape" when the patient was considered dangerous to him or herself or others and as "LWOC" when the patient was not considered dangerous. The policy required that each missing patient incident be reviewed and classified by a psychiatrist as either "Escape" or "LWOC." In the event of an escape, the police were to be notified.

2. Joseph was indicted and charged with two counts of assault in the first degree. He later pleaded guilty to one count of assault in the first degree, and was sentenced, as a second felony offender, to a term of 4 to 8 years.

she was assaulted by Joseph almost two years later (*Dunn v State of New York*, 29 NY2d 313, 318 [1971]).

In *Derdiarian* (51 NY2d at 314), the Court of Appeals observed that "[t]he concept of proximate cause, or more appropriately legal cause, has proven to be an elusive one, incapable of being precisely defined to cover all situations . . . , in part, because [it] stems from policy considerations that serve to place manageable limits upon the liability that flows from negligent conduct" (citations omitted). To establish a prima facie case of proximate cause, a plaintiff must show "that the defendant's negligence was a substantial cause of the events which produced the injury" (51 NY2d at 315). In determining whether a defendant's conduct is a substantial cause in bringing about injury, "consideration should be given to: the aggregate number of factors involved which contribute toward the harm and the effect each had in producing it; whether the defendant had created a continuous force active up to the time of the harm, or whether the situation was affected by other forces for which the defendant was not responsible; and the lapse of time" (*Baptiste v New York City Tr. Auth.*, 28 AD3d 385, 386 [2006]; *see also* Restatement [Second] of Torts § 433).

Applying these principles, there is no basis for disturbing the Court of Claims' finding that Joseph's criminal actions were so attenuated from any negligence on the part of the State in allowing him to elope almost two years earlier as to relieve the State of liability.

While Joseph had eloped from MPC eight times in a 29-month period, in many instances he returned in a matter of days. Despite these elopements and his history of assaultive behavior, before his July 25, 1993 elopement, MPC, exercising its professional judgment, converted Joseph from involuntary to voluntary status and granted him escorted grounds privileges.

Dr. Joel Silbert, a psychologist and Director of Quality Assurance at MPC at the time Joseph eloped, testified that a patient was eligible for escorted grounds privileges as long as he was not dangerous or at risk of injuring himself or doing something untoward while out of the hospital, and that the imposition of an escort did not necessarily mean that a patient was dangerous. The State's expert, Dr. Paul Nassar, a clinical psychiatrist with a subspecialty in forensic psychiatry, testified that, based on the fact that Joseph had been granted escorted grounds privileges several months before he eloped and was classified as LWOC after he eloped, it was a fair assumption that at the time of his elopement Joseph was not in a decompensated psychiatric condition and was not a danger to himself or others.

Dr. Nassar also opined that Joseph's conversion to voluntary status was significant because it was an important part of the treatment plan, i.e., a "statement of positive reinforcement," and that granting Joseph escorted grounds privileges was part of a "well-planned treatment plan" designed to progressively integrate him back into the community. Claimants' expert, Dr. Alan Tuckman, a forensic psychiatrist who consulted at MPC, testified that a psychiatric patient who was in an institutional setting could progress to a point where he or she could be discharged into the community. Accordingly, it is speculative to conclude that, but for his 1993 elopement, Joseph would still have been at MPC in July 1995.

Dr. Tuckman also testified: "A voluntary patient is someone who has either signed themselves in or have been converted subsequently to a status where they have the same obligations and rights of an involuntary patient except, if they wish to leave the facility, they can give a time, I believe it's forty-eight or seventy-two hours['] notice, and it is then up to the hospital to either allow them to leave or convert them to involuntary status, and they have those days in order to do that."

Thus, even if he had been found after his elopement, Joseph, as a voluntary patient, could have refused to stay, and OMH would have had to show clinical grounds to compel his retention.

There is also insufficient evidence that Joseph's condition when he eloped was such that the elopement, without more, would directly result in the assault. Dr. Tuckman testified that he could not, with reasonable psychiatric certainty, identify Joseph's mental status at the time he eloped. Dr. Nassar agreed that the available information was insufficient to determine Joseph's mental status at that time. There was no evidence that Joseph was involved in episodes of violence in the months before he eloped when he was converted to voluntary status and given escorted grounds privileges. Indeed, the last notation of physical violence cited by the majority is that Joseph hit a nurse on November 9, 1991, eight months before he eloped, and was involved in a physical altercation on January 8, 1992, six months before he eloped. These incidents predate Joseph's conversion from involuntary to voluntary status and the grant of escorted grounds privileges in 1993.

The majority gives great weight to Dr. Tuckman's testimony that the chances of Joseph's breaking down and becoming violent again were 100%, especially since he absconded and was not monitored, not medicated, and did not have a support system. However, Dr. Tuckman explained: "With a patient with

a long history of non-compliance with treatment winding them up in trouble, arrests, assaults without arrests, the likelihood of him at some point in the *near future* breaking down and either assaulting somebody or becoming psychotic is very, very high" (emphasis added).

Here, the assault did not occur in the near future; it occurred almost two years later. In that regard, Dr. Nassar testified that the fact that Joseph had a chronic mental illness was not on its own sufficient to support a prediction that he would decompensate some time in the future, and that one could not predict the likelihood that Joseph would assault someone two years after he eloped, because "there are so many intervening factors that go on within the course of those two years from things like, oh, a reemergence of psychiatric symptomatology, a failure of medication, the introduction of substances, alcohol, drugs, the intervention between . . . within two years of interactions with people, family provocative events, disturbing events. There are so many possible issues that could provoke a behavior that it would be impossible to predict that an event two years away from Mr. Joseph's elopement inevitably would have led to this event."

Further, the only evidence introduced concerning Joseph's activities during the time period between his 1993 elopement and his 1995 assault on Ms. Williams was an entry in his criminal history that indicated that he was arrested on March 14, 1995, convicted, upon a plea of guilty, of criminal trespass in the third degree two days later, and sentenced to time served. Although the majority gives weight to the fact that MPC classified Joseph as LWOC, rather than as an escapee, which would have required MPC to notify the police, this arrest and release was an intervening event that served to attenuate the State's negligence in allowing Joseph to elope from his assault on Ms. Williams.

Based on this evidence, the Court of Claims rationally found that the situation was affected by other forces for which the State was not responsible and that the assault on Ms. Williams in July 1995 was too remote in time to be proximately caused by Joseph's decompensation following his removal from treatment and supervision at MPC in July 1993.

*Rattray v State of New York* (223 AD2d 356 [1996], *supra*) does not alter this conclusion. In *Rattray*, this Court found that the hospital was negligent in allowing a voluntary mental patient unsupervised access to an unguarded window, since it was on notice of the patient's escapist and assaultive tendencies. However, in *Rattray,* the patient assaulted the claimants within a day or two of his escape, and proximate cause was not at issue.

The majority also relies on *T.W. v City of New York* (286 AD2d 243 [2001]) and *Steel v State of New York* (Ct Cl, Jan. 15, 2003, Marin, J., UID No. 2003-016-500, *affd* 11 AD3d 673 [2004]) for the principle that a "mere" lapse of time is not enough to preclude negligent conduct from being the legal cause of an injury and that proximate cause may be found long after the negligent act occurs. However, as set forth above, the finding that claimants did not establish proximate cause is based not on a "mere" lapse of time, but on an analysis of the trial evidence, including the expert testimony. Further, in *T.W.*, the lapse of time was not enough to sever the causal relationship because the negligent hiring directly placed the employee, while under the employer's continuous control, in constant contact with children each day during the two-year period between his hiring and the assault. In *Steel*, there was only a 10- or 11-month gap between the assailant's premature release from prison and the assaults, and the basis for expecting a continuation by a prematurely released felon of his violent behavior is not the same as the basis for a mental patient to act out after relapsing without some immediate intervening triggering event.[3]

Indeed, under the majority's analysis, no period of time, be it 5, 10 or 15 years, would suffice to attenuate the State's negligence from a criminal act committed by Joseph. To adopt this view would, for all intents and purposes, make the State an insurer of Joseph, answerable in perpetuity for his criminal and tortious conduct, thereby placing no manageable limit upon the liability flowing from the State's alleged negligent conduct in allowing Joseph to elope, in contravention of the principles set forth in *Derdiarian* (51 NY2d at 314; *see also Devellis v Lucci*, 266 AD2d 180, 181 [1999] ["One who inadvertently facilitates the theft of a vehicle by neglecting to comply with the statute is not answerable in perpetuity for the criminal and tortious conduct of others who may come into possession of the stolen vehicle in the distant future"]). **[Prior Case History: 23 Misc 3d 1135(A), 2009 NY Slip Op 51103(U).]**

---

**3.** It may be noted that Judge Marin, who was also the judge in *Steel*, included *Steel* in the cases he compared to this action, stating that "[t]he Court is aware of no precedent which would offer support for a finding of proximate cause under the subject fact pattern" (23 Misc 3d 1135[A], 2009 NY Slip Op 51103[U], *5 [2009]).