Butler v Cayuga Med. Ctr. (2018 NY Slip Op 00589)





Butler v Cayuga Med. Ctr.


2018 NY Slip Op 00589


Decided on February 1, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: February 1, 2018

525002

[*1]JOHN BUTLER, as Executor of the Estate of CAROL BUTLER, Deceased, Appellant,
v
CAYUGA MEDICAL CENTER et al., Respondents. (Action No. 1.)
KRISTINE SHAW, as Guardian ad Litem of IAN BUTLER, Appellant,
v
CAYUGA MEDICAL CENTER et al., Respondents. (Action No. 2.)

Calendar Date: November 14, 2017

Before: Garry, P.J., Lynch, Clark, Aarons and Pritzker, JJ.


Thaler & Thaler, PC, Ithaca (Thomas D. Cramer of counsel), for appellants.
Levene Gouldin & Thompson, LLP, Vestal (Jared R. Mack of counsel), for Cayuga Medical Center, respondent.
Connors LLP, Buffalo (Christina L. Saccocio of counsel), for Cayuga Emergency Physicians LLP and others, respondents.


Lynch, J.

MEMORANDUM AND ORDER
Appeals from a decision and an order of the Supreme Court (Faughnan, J.), entered December 5, 2016 and December 22, 2016 in Tompkins County, which, among other things, [*2]granted defendants' motions for summary judgment dismissing the complaints.
At around 1:00 p.m. on the afternoon of September 22, 2009, Ian Butler (hereinafter Butler), accompanied by his mother, Carol Butler (hereinafter decedent), sought treatment at Convenient Care at Ithaca (hereinafter CCI), an urgent care facility owned by defendant Cayuga Medical Center (hereinafter CMC). Defendant Eva Briggs, the physician who examined Butler at CCI, recommended that he be transported by ambulance to the CMC emergency department (hereinafter CMC-ED) to obtain a mental health evaluation and to complete certain blood work. Acting against medical advice, Butler had decedent drive him to the CMC-ED. Briggs telephoned defendant Drew Koch, the attending physician overseeing the CMC-ED, to advise that Butler was on the way. Approximately one hour after his arrival at the CMC-ED, Butler was assessed by Shari McDonald, a registered nurse. Butler was thereafter returned to the waiting room to await an evaluation by a physician. Although there is some discrepancy regarding timing, it is not disputed that Butler and decedent left the CMC-ED after they had waited for at least two hours. As a result, Butler never saw a doctor at the CMC-ED, nor did he receive the evaluation and blood work recommended by Briggs.
Tragically, early in the morning of September 23, 2009, decedent was found dead in her home, and Butler was arrested for having caused her death. The morning of Butler's arrest, the police brought him back to CCI, where Briggs examined him and diagnosed him with a number of differential diagnoses, including mental illness. Cayuga County Court later accepted Butler's plea of not guilty by reason of insanity (see CPL 220.15), and Butler remains civilly committed.
In September 2011, plaintiffs — Butler's father and Butler's guardian ad litem — separately commenced these medical malpractice actions claiming that CMC and Briggs should have recognized that Butler was a danger to himself and others, that Butler should not have been allowed to refuse ambulance transport to the CMC-ED and that CMC and Koch failed to properly triage and screen Butler upon his arrival at the CMC-ED and failed to provide timely treatment. CMC, Briggs, Koch and defendant Cayuga Emergency Physicians LLP (hereinafter CEP) — Briggs' and Koch's employer — moved for summary judgment dismissing the complaints. Supreme Court granted the motions and plaintiffs now appeal.[FN1]
In a medical malpractice action, the plaintiff bears the burden of establishing that the defendant "deviated from acceptable medical practice, and that such deviation was a proximate cause of the plaintiff's injury" (Gallagher v Cayuga Med. Ctr., 151 AD3d 1349, 1351 [2017] [internal quotation marks and citation omitted]). Accordingly, on a motion for summary judgment, the defendant must establish "either that there was no departure from accepted standards of practice in the plaintiff's treatment or that any such deviation did not injure the plaintiff" (D'Orta v Margaretville Mem. Hosp., 154 AD3d 1229, 1231 [2017]). Liability will not arise from "a mere error in professional judgment," and where, as here, the alleged malpractice involves mental health treatment, "it must be shown that the treatment decisions represented something less than a professional medical determination . . . or . . . were not the product of a careful evaluation" (Gallagher v Cayuga Med. Ctr., 151 AD3d at 1351 [internal quotation marks and citation omitted] see Schrempf v State of New York, 66 NY2d 289, 295 [1985]).
CEP, Briggs and Koch supported their motion for summary judgment with an affidavit by physician David E. Baum, and CMC's submissions in support of its motion included an affidavit by physician Gary Johnson. Baum and Johnson each rendered opinions based on a review of all defendants' submissions, including Butler's medical records and deposition testimony given by Koch, Briggs and McDonald. The medical records indicate that when Butler arrived with decedent at CCI, he was first evaluated by a nurse who documented Butler's past medical history, which included epilepsy, seizures and psychotic episodes. The nurse noted "[n]ausea, status post seizure. Patient states that while away . . . [he] had two grand mal seizures. Has been complaining of blurred vision, headache[;] confusion during triage. Mother present during triage; states patient not compliant with [anti-seizure] meds." When Briggs examined Butler approximately 25 minutes later, she documented that he felt like he was "tripping" and that "the world [was] going to end." Butler reported that he had been recently depressed, felt confused and had previously been admitted for a diagnosis of psychosis due to epilepsy. Briggs also noted that Butler was well-appearing, in no pain or distress and alert, but tangential, which she later explained during her deposition meant that Butler was not directly responding to questions. Butler denied having any prior or current suicidal or homicidal gestures or thoughts. Briggs concluded that the possible or differential diagnoses were metabolic disorder/hypoglycemia, injury, seizure/post-ictal and intercranial bleed and/or psychosis, and her clinical diagnosis was seizures and psychosis. Briggs referred Butler to the CMC-ED and offered an ambulance to effect the transfer. Butler instead signed a form refusing to be transported by ambulance against medical advice, and decedent drove him directly to the CMC-ED.
At approximately 1:45 p.m., within an hour of Butler's arrival at CCI, Briggs telephoned Koch at CMC and told him that she had referred Butler to the CMC-ED and that Butler was having hallucinations, was not homicidal or suicidal, had a history of seizures and was on anti-seizure medication. She also told Koch that her assessment of Butler was acute psychosis and that Butler needed a mental health evaluation and a blood test to check the levels of his anti-seizure medication. Koch testified that the information relayed by Briggs did not lead him to conclude that Butler required an immediate mental health evaluation. Accordingly, he prepared a notification form and gave it to the CMC-ED's ward clerk. In general, according to Koch, a determination with regard to how long a patient diagnosed with psychosis must wait to be seen by a physician would depend on the assessment of the triage and charge nurses.
Butler and decedent arrived at the CMC-ED at approximately
2:15 p.m. McDonald performed her triage assessment approximately one hour later. During her deposition, McDonald explained that to determine how quickly a patient should be seen, CMC used an algorithim known as the emergency severity index (hereinafter ESI). The ESI is used to prioritize admission on a scale of level 1 to level 5. A level 1 patient would be one with immediate life-threatening treatment needs, a level 2 rating presents a high-risk situation in which the patient should be seen as soon as possible, and levels 3, 4 and 5 are for less acute patients, differentiated by the number of resources needed to address a patient's treatment, with level 3 requiring two or more resources. McDonald testified that because Butler had not been taking his anti-seizure medication and reported that he was sad, she assigned Butler an ESI level 3. The records indicate that McDonald's assessment also included a safety assessment screen and that Butler answered "No" to the question, "Do you feel emotionally and physically safe?" Butler's answers to the six follow-up questions comprising a "lethality risk screen" are not documented, but McDonald testified that she recalled asking him, for example, to "tell [her] more," and that he told her that he felt "strange" when he took his anti-seizure medication and that he was sad about a recent breakup. Additionally, McDonald testified that Butler told her that although he had been experiencing hallucinations, this symptom had subsided. McDonald also recalled asking Butler whether he had thoughts of harming himself or others, and Butler [*3]responded that he did not. She further testified that Butler and decedent told her that they were there because he was not taking his anti-seizure medication.
Based on his review of the records, Baum opined that Briggs timely and thoroughly examined Butler and reasonably determined that he needed a mental health evaluation and the specialized blood work — resources that were not available at CCI. Further, Baum opined that Briggs properly offered to have Butler transferred to the CMC-ED by ambulance and explained the risks associated with failing to travel by ambulance. According to Baum, Briggs had no basis to conclude that Butler did not understand these risks or that he was at risk of harming himself or others. Similarly, Johnson opined that Briggs did not have a medical or legal basis to physically prevent Butler from leaving CCI to go to the CMC-ED [FN2]. Johnson also explained that the purpose of the ambulance transport would have been to ensure Butler's safe arrival at the CMC-ED. Johnson further opined that there is no basis to conclude that Butler would have been seen faster or received a higher triage level if he had arrived at the CMC-ED by ambulance. Accordingly, Baum and Johnson opined that not only did Briggs act within the standard of care, no purported deviation caused any of plaintiffs' claimed damages.
Baum opined that Koch, the attending physician at the CMC-ED, properly documented the information provided by Briggs and provided such documentation to the CMC-ED ward clerk, who would customarily transfer the information to the triage nurse. It is not disputed that Butler was rated level 3; according to Baum, given the evidence with regard to the high number of patients waiting to be seen, it was reasonable that Butler would have to wait to be treated. Koch was not aware that Butler was planning to leave the CMC-ED, and neither Butler's presentation to Briggs nor to the triage nurse indicated that he was a danger to himself or others. Accordingly, Baum opined that Koch's conduct in response to Briggs' telephone call was appropriate and no purported deviation by Koch caused plaintiffs' damages.
In support of CMC's motion, Johnson noted that McDonald completed the safety assessment screen and, as a result, properly concluded that Butler needed a mental health evaluation and submitted a request for the evaluation. Further, he opined that McDonald's determination to rate Butler at level 3 rather than level 2 was a reasonable exercise of her professional judgment. Johnson explained that because triage "is a preliminary process" and not "a full patient evaluation," it does not include gathering and reviewing prior health records. In Johnson's view, the evidence presented — that Butler reported that he did not feel safe, he denied feeling suicidal or homicidal, was coherent and able to explain that he was sad and that he did not like the way he felt when he took his anti-seizure medication — supported the level 3 rating.
Addressing factors that may have warranted a higher risk rating, Johnson acknowledged that a patient who presents as an elopement risk — the risk of leaving without being seen — may warrant the higher risk rating of level 2. He pointed out, however, McDonald's explanation that she determined that Butler was not an elopement risk because he was with decedent and both had agreed that they would wait for the blood work and evaluation. With reference to the ESI, Johnson explained that a patient, like Butler, who presents with vital signs outside of normal ranges does not necessarily require a higher rating, nor is it mandatory where, as here, a patient reports his or her pain to meet or exceed 7 out of 10 on a scale of 1 to 10. As to plaintiffs' claims with regard to Koch's alleged failure to relay Briggs' information to the triage staff, Koch testified that he did complete the form and, according to Johnson, there was no basis to conclude that the [*4]information would have changed McDonald's rating given her general assessment that Butler was calm and not a danger to anyone. In sum, Johnson opined that the nature of a triage assessment is that a reasonable practitioner could have rated Butler either a level 2 or a level 3 and been within "the range of acceptable judgment."
In our view, defendants met their prima facie burden of demonstrating entitlement to judgment as a matter of law dismissing the complaints against them. Plaintiffs contend that Supreme Court should not have considered testimony given by Briggs and McDonald with regard to Butler because such evidence would be inadmissible pursuant to CPLR 4519,[FN3] the Dead Man's Statute. The statute provides that "a party . . . interested in [an] event . . . shall not be examined [at trial] as a witness in his [or her] own behalf . . . against . . . a mentally ill person" (CPLR 4519). Generally, evidence that would be inadmissable under the Dead Man's Statute should not be relied upon to establish prima facie entitlement to summary judgment (see Miller v Lu-Whitney, 61 AD3d 1043, 1045 [2009]). We discern no error here inasmuch as Briggs' testimony was consistent with the medical records, on which the experts relied, and the records were properly considered on the motions and provided sufficient, independent support for the expert opinions (see People v Ortega, 15 NY3d 610, 617 [2010]; Beyer v Melgar, 16 AD3d 532, 533 [2005]; see Vincent C. Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C4519:1). Plaintiffs' challenge to the use of McDonald's testimony is without merit because McDonald, who has not been an employee of CMC since 2010, is not an interested person (see Matter of Thomas, 124 AD3d 1235, 1238 [2015]; Vincent C. Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C4519:2). Accordingly, we agree with Supreme Court that defendants' submissions were sufficient to shift the burden to plaintiffs to raise a triable issue of fact (see Gallagher v Cayuga Med. Ctr., 151 AD3d at 1354).
In order to raise a triable issue of fact, plaintiffs were obligated to establish "a departure from accepted medical practice, as well as a nexus between the alleged malpractice and [plaintiffs'] injur[ies]," and "general allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice," are not sufficient (Grzelecki v Sipperly, 2 AD3d 939, 941 [2003] [internal quotation marks, citations and brackets omitted]). To this end, plaintiffs submitted an affidavit by Kenneth Darren Katz, a doctor board-certified in emergency medicine. In general, Katz opined that the medical care provided by Briggs, Koch and the triage staff at the CMC-ED "deviated from accepted practice[,] that they failed to use judgment that was reasonably prudent under the circumstances, and that their failure to exercise due care was a substantial factor in bringing about [decedent's] death . . . at the hands of [Butler]." Specifically with respect to Briggs, Katz opined that she should have accessed and reviewed Butler's medical records generated during his inpatient psychiatric treatment in 2007. In Katz's view, "a careful examination of" these records would have revealed that, in the past, Butler had experienced paranoia and suicidal and homicidal ideation. In sum, Katz opined that Briggs should have recognized that Butler lacked capacity to refuse ambulance transport and should not have allowed him to leave CCI with decedent. As for Koch, Katz opined that, assuming he was armed [*5]with the knowledge that Briggs provided, Koch failed to ensure that Butler was promptly admitted to receive the recommended evaluation and blood work.
Specifically as to the triage staff at the CMC-ED, Katz opined that there was an "obvious discrepancy" in the triage assessment, inasmuch as the lethality risk screen was not completed. Further, according to Katz, Butler should have been considered level 2 or "'high risk' . . . given his clear psychosis and lack of safety which would mandate expeditious admission to the emergency department." In sum, Katz claimed that defendants exhibited "poor judgment" that resulted in "a domino effect," and that "[a]t any one point[,] there was opportunity to intervene during the hours and two health care visits and provide the acute medical and psychiatric care . . . required [to] stave off the unfortunate and tragic outcome."
We find that Katz's affidavit failed to raise a material factual issue. Katz did not provide a factual basis for his conclusion that an urgent care physician has access to records generated during prior hospitalizations or that, in this case, the applicable standard of care included a comprehensive review of such records prior to determining that Butler needed to be transferred to the CMC-ED for a mental health evaluation and blood work. Briggs was aware that there was a prior hospitalization, and plaintiffs do not challenge her conclusion that further evaluation at the CMC-ED was necessary. Although he declined to be transported by ambulance, Butler followed Briggs' instructions and went without incident to the CMC-ED to obtain further treatment. Katz offered no factual support for his conclusory contention that Butler would have received greater attention during triage or that he would have been assigned a higher triage level had he arrived by ambulance (see Longtemps v Oliva, 110 AD3d 1316, 1319 [2013]). Indisputably, Briggs' responsibility for Butler's treatment ceased once she transferred him from CCI to CMC (see Dombroski v Samaritan Hosp., 47 AD3d 80, 85 [2007]). Similarly, to the extent that plaintiffs claim that Koch failed to ensure that Butler received more expeditious treatment, Katz does not opine that Koch violated any standard of care by recording the information provided by Briggs, providing it to staff and permitting Butler to go through the triage assessment.
Finally, turning to plaintiffs' claims against CMC, the paramount issue is McDonald's failure to rate Butler a triage level 2 pursuant to the ESI. It is not disputed that the ESI was the applicable standard governing McDonald's assessment and that the ESI Implementation Handbook (hereinafter handbook) is the guidance document used to implement the ESI. The handbook explains that a high risk patient is identified by a "brief patient interview, gross observations, and . . . the 'sixth sense' that comes from experience" (Emergency Severity Index [ESI] Implementation Handbook at 11 [2012]). The handbook recommends that a patient who is suicidal, homicidal, psychotic, violent or presents an elopement risk should be assigned level 2. In our view, Katz's opinion with regard to the triage assessment is conclusory, speculative and not based on facts in the record. Notably, Katz does not challenge or address Johnson's opinion that either a level 2 or level 3 rating would have been reasonable. The evidence in the record is that, during the triage assessment, Butler denied that he had any homicidal and suicidal ideations and confirmed that his hallucinations had subsided. There is no evidence that Butler was combative or hostile — characteristics that, pursuant to the handbook, are illustrative of a level 2 mental health patient. Katz did not directly address McDonald's explanation — given with reference to Butler's presentation and the ESI — as to why she determined to assign Butler a level 3. Katz's opinion that there were factors warranting a level 2 designation appears to be based on hindsight, not the facts of Butler's presentation during the triage assessment (see Kristal R. v Nichter, 115 AD3d 409, 412 [2014]). In our view, Katz's opinion that McDonald should have exercised her nursing judgment differently speaks at most to an "error in professional judgment" for which liability does not attend (Gallagher v Cayuga Med. Ctr., 151 AD3d at 1351; see [*6]Grzelecki v Sipperly, 2 AD3d at 941-942). Having found that plaintiffs failed to raise a triable issue of fact, Supreme Court properly granted defendants' motions for summary judgment dismissing the complaints.
Garry, P.J., Clark, Aarons and Pritzker, JJ., concur.
ORDERED that the appeal from the decision is dismissed, without costs.
ORDERED that the order is affirmed, with one bill of costs.



Footnotes

Footnote 1: Plaintiffs appeal from Supreme Court's decision, as well as its order granting defendants' motions. As no appeal lies from a decision, the appeal therefrom must be dismissed (see Shlang v Inbar, 149 AD3d 1402, 1403 n 1 [2017]).

Footnote 2: Johnson addresses the claims against Briggs and Koch because both provided treatment at CMC facilities. 

Footnote 3: Although plaintiffs did not raise this issue before Supreme Court, it "is reviewable on appeal because it presents an issue of law which appear[s] upon the face of the record and could not have been avoided by [defendants] if brought to [their] attention at the proper time" (Highbridge Dev. BR, LLC v Diamond Dev., LLC, 67 AD3d 1112, 1114 n 2 [2009] [internal quotation marks and citation omitted]).